Jackson, ex dem. George Clark, *against* John Reeves.

NEW-YORK,
Nov. 1805.

Jackson
v.
Reeves.

EJECTMENT, for lands in the town of *Catskill*, claïm-ed by the plaintiff under a patent to *Helmer Jansen*, dated the 15th of *January*, 1703—4, which in 1733 escheated to the crown, and were, on the 22d of *August*, 1738, re-grant-ed to *John Lindsey*.

The cause was tried in *September*, 1802, when the defendant set up a title under the *Catskill* patent, granted the 28th of July, 1688, and to maintain it, contended, that the first of the five plains mentoned in that patent began at the junction of the *Catskill* and *Katerskill*. He also insisted on an adverse possession, to support which, he relied on the recital in a lease for 20 years, granted in 1784, setting forth a former demise for the same period from 1771, and surrendered on taking the new term in 1784. On the part of the plaintiff, it was ur-ged at *nisi prius*, that the premises could not be covered by the *Catskill* patent, as the first of the five plains com-menced at *Catskill* church, to which, if the four other plains were added, and from the northern, southern, eastern, and western extremities of the whole four lines, due north, south, east, and west, were run, the terminations to be closed by straight lines, which it was insisted was the true construction of the patent, the premises would be excluded, and therefore could not be, from the defendant's own shew-ing, his right. Of the adverse possession, the plaintiff de-nied the recital to be any evidence.

The judge having charged for the plaintiff's construc-tion of the patent, the jury found a verdict in his favor.

The application now was, to set it aside, on account of the misdirection of the judge, and because the verdict it-self was against evidence.

The case was most ably argued by *W. W. Van Ness* and *Van Vechten* for the defendant, and *Henry* for the plain-tiff, but, as it would be impossible to do justice to their

Vol. III.                    O o

The first plain patent, is not at the j. net on of the *Catskill* and *Kater-skill*, but com-mences at *Cat-skill* chu.ch. The four miles *from* the five plains men-tioned in the *Catskill* patent, are four miles due north, south, &c. from the northern, southern, &c. extremity of the-plains, *ut semb.* In run-ning out pa-tents, a line northward, &c. means a line due north, &c. Where a grant is susceptible of two con-structions, that which is most favorable to government is to be adopted.

positions, without diagrams of the locations they supported, and as the principles most relied on, would be applicable to no other grant, not worded exactly like the one in question, the decision of the court has been thought to contain all that need be reported.

THOMPSON. J. The lessor of the plaintiff claims title to the premises in question, under a patent to *Helmer Jansen*, bearing date the 15th day of *January*, 1703. It is admitted that the premises in question, are covered by this grant, and the plaintiff has deduced a clear and undisputed title to himself under that grant. His right to recover is therefore undeniable, unless taken away by some older patent, or the defendant is protected by length of possession. The defence set up embraces both these grounds. I shall examine them in their order. In the first place, it is contended that the premises are covered by the grant, usually known by the name of the *Catskill* patent, bearing date the 28th of July, 1688. This being the oldest patent, it must first be satisfied, wherever the two come in collision with each other. It becomes necessary, therefore, to locate the *Catskill* patent. The description of the land as contained in the grant, is as follows : " a certain tract of land with the appurtenances, lying, situate, and being at a certain place, called *Catskill*, in the county of *Albany*, on the west side of *Hudson's river*, and on the south and north sides of the creek or kill, consisting of five great plains, the first called *Waihackeek*, the second *Wichquanachtekak*, the third *Pachqugack*, the fourth *Apiskawachkok*, and the fifth *Potick*, together with the woodland adjoining to the said plains, extending, four *English* miles round the said plains, that is to say four *English* miles from the said plains eastward, four *English* miles northward from the said plains, four *English* miles westward from the said plains, and four *English* miles southward from the said plains." In the location of this patent, two objects of inquiry present themselves, 1st. Where the five great plains intended by the grant are ? and 2d. the manner of locating the wood-land adjoining them

It is contended, on the part of the defendant, that the first plain is at the junction of the *Catskill* and *Katerskill.* If so, then upon any of the locations contended for, on either side, the premises would be included in the *Catskill* patent. On this point, the testimony is somewhat contradictory. Several very ancient witnesses were examined on both sides ; those on the part of the defendant, tending very strongly to establish the first plain at the junction, and those on the part of the plaintiff as strongly contradicting it, by locating the first plain in another place. Thus, from these witnesses, some doubt and difficulty might arise, respecting this part of the case. But there are certain facts, either admitted on both sides, or established by uncontradictory testimony, that appear to me to afford an irresistible conclusion, that neither of the plains intended by the grant, could be at the junction of the *Catskill* and *Katerskill.* In the first place they are called in the patent, great plains, and none of the witnesses pretend to describe the plain at the junction, as containing more than about two acres of land. Again, the junction of the two creeks is upwards of two miles distance from the other four plains, acknowledged on all sides, which renders the defendant's claim highly improbable. But, what I think puts an end to the question is, that in the first patent, in the year, 1680, these plains are described as lying above the land of *Eldert De-goy,* which are admitted to be the lands now owned by *Samuel Van Vechten,* a part of which lie along up the *Catskill* and *Katerskill.* These circumstances I consider as affording unanswerable evidence, that the first plain is not at the junction of the two creeks. The witnesses on both sides, who were examined at to this plain, might have been very honest in their testimony. From the very nature of the subject, the fact was to be established in some measure, by reputation ; and from several of the witnesses it appears, that the location of the first plain has a long time been a subject of dispute, and it is not be wondered at, that different reputations should be in circulation on the question. The location of these plains was matter of fact

NEW-YORK,
Nov. 1805.

Jackson
v.
Reeves.

for the jury, to be ascertained from all the light given them upon the trial; and they have by their verdict determined, that neither of the great plains mentioned in the patent, is at the junction of the *Catskill* and *Katerskill*, with which determination I am fully satisfied. This point being settled, the five great plains must be taken as lying together upon the *Catskill*, in the manner contended for by the plaintiff, forming a very irregular figure. The next question then for examination is, the location of the wood-land, round these plains. On the part of the defendant it is contended, that the patent ought to be located in such a manner, that from any part of its out-bounds, a line of four miles would touch some part or other of the flats; or in other words, that the plains should be considered as rolled out or extended four miles in every direction. This location is certainly impracticable, on account of the irregularity of the figure formed by the five great plains. The sinuosity of the exterior lines being such, that by such extension, many of the lines would interfere one with the other. Where the given object is a regular figure or base, no difficulty or absurdity will arise in locating a rolling patent: It is otherwise, however, when the base is irregular like the one before us. If the terms of the grant were such, that it was susceptible of no other location, we might be bound from necessity, to adopt the one above mentioned. But I think that is not the case in the present instance. There appears to me to be a location more rational, more conformable to the terms of the grant, and free from any difficulty or absurdity in practice, and by which the patent will cover but about one half the land it would, according to the construction contended for on the part of the defendant; and it is an established rule, that when a grant is susceptible of two constructions, that should be adopted which is most favorable to government. The enormity of this grant, according to the defendant's location, is much against adopting his construction; it will contain 57000 acres of land, swallowing up five whole patents, and interfering very essentially with several others. This inconvenience is indeed

in some measure experienced, upon all the locations contended for; but less in proportion as a lesser quantity of land is included. Much stress has been laid by the defendant's counsel, in support of their location, upon a survey of the out lines of this patent, made by *John Beaty*, deputy surveyor-general, in the year 1719, and who appears to have adopted the construction now contended for, as far as the same was practicable. This it is said, being done by a public officer, must be considered an act of government, and entitled to great weight. For what purpose this survey was made, does not appear, nor is it easily perceived. No instruction accompanied the warrant of council; no construction appears to have been given by government to this grant; and no possible object could have been answered by it, as an act of government, except to serve as a guide to prevent any interference in subsequent grants. That this could not have been the object, however, is pretty evident, from the acts of government soon after; for in the year 1733, we find, by the proceedings under the writ of *escheat*, that *Helmer Jansen* died intestate, leaving no heir, by reason whereof, the title to the lands contained in the grant to him and of which he died seized, became revested in the crown; and in the year 1738, were again granted to *John Linsey*, all which lands according to the defendant's construction, and *Beaty's* survey, are covered by the *Catskill* patent. If *Beaty's* survey was intended as a guide to government, in issuing subsequent grants, it is not probable that so recently thereafter, a patent would have been issued for lands, comprised within the *Catskill* patent, according to *Beaty's* survey; I cannot therefore, view this survey in any other point of light, than as an *ex parte* act, or at most, as the opinion of *Beaty*. Probably, however, he run according to the direction of the patentees, because we find him assuming one of the great plains, to be at the junction of the *Catskill* and *Katerskill*, than which nothing appears to me, more unwarrantable or less founded. This survey, therefore, I think not entitled to much weight or influence, upon the present question.

If the defendant's construction of the *Catskill* patent be rejected, the plaintiffs right of recovery is disentangled from every embarrassment, with respect to paper title ; because, upon no other possible construction, can that grant be extended to the premises in question.   It may, however, be proper to examine whether that patent be susceptible of any other, and what location ; several have been suggested by the plaintiff's counsel, one of which contemplates finding a common centre of the five great plains, from thence circumscribing a circle round these plains, with a *radius* of four miles in length.   I cannot adopt this location, although the one principally relied upon on the part of the plaintiff. There are no words in the grant necessarily implying, that the exterior line must be a circle.   The only term made use of in the description of the premises, that looks like requiring a circular figure, is the word *round*, " together with the wood-land adjoining to said plains, extending four *English* miles *round* the said plains." This term *round* may, however, grammatically as well as in common parlance be satisfied, by giving land on *every side* of the plains, let the exterior lines be either circular or straight.   It is difficult, if not impracticable to find a common centre, to a figure so irregular as the one formed by these plains.   It is impracticable with a chain and compass, to run out a circle.   It is true, you may, from a given centre, run such a number of *radii,* as that a straight line from one to the other, would very nearly approach to a circle, but the difficulty and inconvenience attending it, appears to me a sufficient objection to this mode of location, unless compelled to adopt it, by the most direct and unequivocal terms of the grant.   So far from that being the case in the present grant, I think it contains words which will exclude any location contemplating a common centre.   This patent gives the five great plains, and then the woods round the same, extending four *English* miles *from* the said plains, which I understand the expression four miles *from,* means four miles exclusive of the plains ; that is, beginning at the exterior part of the plains, and from thence running four miles.   If a common centre be taken, and the four miles calculated from that, there would

NEW-YORK,
Nov. 1805.

Jackson
v.
Reeves.

be a diminution of that line equal to the whole extent of the plains, which would be contrary to the terms of the grant. When any monument whatever is given as an object to run *from*, the exterior part, and not the centre, is the place of beginning. This objection will also apply to that location, which contemplates a square, formed from a common centre. The only remaining location which has been suggested, is the one adopted upon the trial, and which, from the best examination I have been able to give the subject, is, in my judgment, the one best warranted by the terms of the grant. This location is made by running lines of four miles in length, due north, south, east and west, from the extreme northern, southern, eastern and western parts of the plains, and closing those lines from the extremities by straight lines. This mode appears to me to be supported by legal principles, and will give effect to every part of the description of the premises, contained in the patent. The great and leading requisites in the location of every tract of land, are to have fixed places to start from, courses and distances given, and, closing the exterior lines : a recurrence to the description in the grant is again requisite, to see whether it furnishes these data. The five great plains are given, " together with the wood-land adjoining the said plains, extending four *English* miles round the said plains, that is to say, four *English* miles from the said plains eastward, four *English* miles northward from the said plains, four *English* miles westward from the said plains, and four *English* miles southward from the said plains." The given object to start from here, is the plains; the distance to run is four miles; the courses are northward, southward, eastward and westward; and it is a settled rule of construction, that when courses are thus given, you must run due north, south, east and west. The place of beginning must be at the exterior part of the plains, because the distance is four miles *from* the plains, which, as I have before observed, must mean exclusive of them. By this process, then, the four corners of the tract are ascertained. These corners must be closed by lines of some description, in

NEW-YORK,
Nov. 1805.

Jackson
v.
Reeves.

order to satisfy the terms in the grant, because the wood-land is to lie round, that is to say, on every side of the plains ; and when two objects are given, and a line to be run from one to the other, no rule can be more proper than to run a straight line. By this mode of location, it is admitted, that the premises in question will not fall within the *Catskill* patent. The only remaining question for consideration is respecting the adverse possession set up against the plaintiff's right of recovery in this action. The possession of *Abraham Van Gordon*, who took a lease under the *Catskill* claim, in the year 1784, must be deemed adverse to the plaintiff's title. This however, is not a sufficient length of time to protect the defendant. It is contended also, that *Johannis Van Gordon*, the father of *Abraham*, was previously in possession under the same title, and the recitals in the lease to *Abraham*, of *Johannis* having taken a lease in the year 1771, have been in some measure relied on to establish the fact. This lease has justly been made the subject of some severe criticism by the plaintiff's counsel ; it is enough however, to observe, that these recitals are no evidence in the parties own favor, and therefore afford no proof of the existence of a lease to *Johannis Van Gordon.* The parol testimony respecting the possession of *Johannis* is vague, uncertain and contradictory. The characters of some of the witnesses have been impeached, and the matter involved in some doubt and obscurity. The question of adverse possession was a subject proper for the determination of jury. The whole matter was fairly submitted to them, and the verdict is, I think, with the justice of the case.

My opinion, therefore is, that judgment ought to be given for the plaintiff.

LIVINGSTON, J. It is not easy to pronounce this a verdict against evidence, as it regards either the defendant's possession, or the location of the first flat or plain mentioned in the *Catskill* patent, both of which the jury have found against him. There was much and contradictory testimony on both points. In such cases, we cannot disturb a verdict, without encroaching on an essential pre-

rogative of a jury, which is to ascertain the degree of credit due to different witnesses. With respect to the firs flat, I should, if on the jury, have decided as they did. The survey of *Beaty* proves little more, than that at an early period, the flat, at the junction of the *Catskill* and *Katerskill*, was shewn to him as such. This survey, being made for those whose interest would be promoted by this location, it would not be difficult, at a time when land was not of much value, for the patentees first to talk of this as the first flat, and then procure others who would be willing to shew it as such. Government paid no attention to what was going on, and those who might have been interested in fixing the flat elsewhere, may not have known when the survey would be made. As to the surveyor himself, it is not very probable he took uncommon pains in deciding where it lay. He was acting under the immediate direction of the patentees, and must have known that if the lines run, were not conformable with their boundaries, it would be their own folly, and that neither the public nor strangers could be prejudiced by it.

The plaintiff's witnesses, who in general are very aged men, declare they never remember any flat at the junction of these kills. From this and other circumstances, particularly the distant position of this spot from the other flats, and that they are described in the first patent as lying above *Eldert Degoy*, I cannot help thinking the plaintiff's location the most correct. I am as little inclined to send the cause back to have the question of possession re-examined. Whatever doubts may exist on this point, they are not so great as to require a further investigation, or to warrant a conclusion that the jury did wrong.

The only important point, therefore, according to my view of this cause, arises out of the judge's charge. If his opinion on the defendant's construction were incorrect, considering that the question on which it was given, involved the great merits of the controversy, a new trial must be the consequence ; but before this be done, we must be satisfied that there is no other way of locating or survey-

ing the *Catskill* patent, than the one suggested by the de-fendant, who insists, " that from every part of its external " bounds, a line of four miles should touch some part or oth- " er of the exterior of one or other of the flats, and should " never be farther from, or nearer, to the plains." In this way of laying out the patent, it will contain 57,000 acres, The objections to it are strong.

If the first and second patents, between which is an in-terval of only eight years, are compared, we are aston-ished at the difference of their contents on the defendant's principles. The first comprizes a small tract whose cir-cumference was by estimation, *only four English miles*, which would contain only 640 acres. There are no words in the second, from which can be inferred an in-tention of the patentees to ask, or of the government to grant, a single acre more than passed by the former. The first grant was to *Elizabeth Salisbury*, in trust for the chil-dren of *Silvester Salisbury*, and to *Martin Garretson.*—— The estate, as it respects the children of *Salisbury*, not be-ing thought sufficiently definite, a new patent is obtained, for the purpose *of more certainty limiting the estate*, than was expressed in the first. If so, and no extension of lim-its were in view, it is a reason for examining the defend-ant's pretensions with more than usual severity. A grant had been obtained from the *Indians*, in 1678. In less than two years after a patent issues. At that time the patentees must well have known what they had purchased from the *Indians*, or intended to ask of government, and with this knowledge we find them content with a tract containing only four miles in circumference. Surely after this under-standing and exposition of their rights, they should not be indulged without very conclusive reasons in an interpreta-tion so very variant from the first; especially, when in-stead of alleging that the first grant contained less land than they were entitled to, a different motive is stated for asking a confirmation. Unless, therefore, it be utterly im-practicable to locate this patent in any other way than the

one which has been already mentioned. I should be opposed to it, on the ground of its extravagance, and its being manifestly either against the sense of the parties themselves, or a surprise and deception on government.

But independent of any rule which may be applicable to the present case, as drawn from the conduct and cotemporaneous sense of the patentees, it is a general rule of law, that in the exposition of governmental grants, that construction, when the terms are inexplicit, shall be adopted, which is least favorable to to the grantee. No one one will pretend to say, that the location of this patent is free from difficulty, nor that the defendant's interpretation of its boundaries, is not the most extensive and advantageous for him that can be devised.

It is admitted, that to run the outline on this principle, if not impracticable, would be a work of uncommon labour. This is something against the principle itself. Government would hardly think it necessary to impose on the patentees a labour so unusual, for no patent perhaps, ever issued under which a similar or circular location was necessary. It is true, some surveyors admitted the practicability of running out the patent in this way, but its being merely so, with infinite labour, is no great argument in favor of that mode alone being correct. If surveyors had not sworn to its practicability, I should entertain very strong doubts, whether it were possible, with any pains whatever, to survey this tract so as exactly to correspond with the defendant's location.

*Beaty's* survey, unless possessions under it had been acquiesced in, is not worth much. Such acts generally are *ex parte*, and cannot bind the government or third persons. It is evidence of one thing only, that the patentees were determined to lose nothing which the patent, by any possible construction, could embrace. So far from government assenting to this extravagant location, patents without number have been granted for lands, and which are possessed accordingly, within what are now pretended to be

the bounds of *Catskill*. It is no answer to this objection, that even on the plaintiffs' construction this is the case.— This only proves, that the plaintiff may be willing to allow, that the patent contains more land than it really does, so that it does not interfere with him, but not that either construction is right. Still less is the difficulty satisfied by asserting, that patents frequently interfere with each other. This must sometimes happen, but can an instance be mentioned in which entire tracts have been granted within the limits of a former patent? If this, with the acquiescence of the *Salisburys* to the possession under these patents, with *Garretson's* being a patentee in one of them, and the *Indian* deed to *Outen Bougert*, executed before *Garretson*, in 1684, be not regarded as a cotemporaneous understanding of government and of the parties, I hardly know what is to satisfy us of such an exposition. Upon the whole, the defendant's construction appears to me so very extravagant, so contrary to the sense of the original parties, so much at variance with other acts of government, and so extremely difficult to carry into effect, that I think the judge was right in not adopting it. It cannot, therefore, be very necessary, to examine either of the other constructions, or whether the right one was adopted at the trial, for even if the judge were mistaken in his opinion as to the true mode of location, if the premises are not within the patent, according to the bounds as set up by the defendant, it can be of no service to him to grant a new trial. Here, therefore, I shall only say, that the opinion expressed to the jury was full as liberal as the defendant had a right to expect, and probably leaves within this patent, a much more extensive tract than it was intended to grant, or than the expressions used necessarily comprehended. But of this error, if it be one, the defendant has no right to complain. His motion, therefore, for a new trial must be denied.

KENT, C. J. Two questions are raised upon this case, 1st, as to the construction of the *Catskill* patent, and 2d,

as to the length and effect of the adverse possession of the defendant.

1. There cannot be much doubt, I apprehend, but that the first of the five great plains was at the church, as contended for by the plaintiff, and not at the junction of the *Catskill* and *Katerskill*, as asserted on the part of the defendant. In addition to the weight of traditional information, the words in the elder *Catskill* patent, locate the plains *on the Catskill creek, above the land of Eldert Degoy.* The patents also speak of five great plains, and there is no evidence that there ever was any thing like a great plain at the junction of the two creeks. This is a decisive fact on the subject, and assuming it then as correct, that the plains are to be located at the *Catskil* church, and upwards, the question is how the wood-land adjoining the plains is to be laid out. The plains appear to have been considered as the substantive part of the grant, and the wood-land as an appendage merely, still the wood-land round the plains *is* granted, and the only difficulty is as to the mode of location. Several modes of location have been presented, and perhaps none of them altogether free from objection. The wood-land is to *adjoin* the plains and to be *round* them, and to extend four miles in each direction from the plains. In the elder patent the wood-lands are not so particularly described as in the younger, and yet the latter professedly intended merely to *confirm* the grant of the land contained in the former patent, and which description was taken from the original *Indian* deed of 1678. The 1st patent and *Indian* deed speak only of wood-land for outdrift for cattle, containing by estimation, *in circumference* four miles. A circumference with a radius of four miles from a common centre of the plains will best comport with the words of the patents, *in circumference* or *round the plains.* Nor is this boundary altogether unknown, for the northern line of the state of *Delaware, "si parva magnis,"* is ascertained in the same manner by a circle, whose centre is the middle of the town of *Newcastle.* In the case of *Penn* v. *Lord Baltimore,* (1 *Vez.* 444,) one question was about drawing part of a

circle about the town of *Newcastle*, and *Lord Hardwicke* held, that the centre must be a mathematical point from the middle of the town, as nearly as the same could be computed, and that such a mode was the fairest way, for otherwise the exterior line would be too far in some parts of it. But this plan will not strictly answer all the words of the description, for the line is in each direction to be four miles *from the plains*, and the circumference of the circle might be only half that distance in some parts of it. There are some reasons why I should prefer the first mode contended for by the plaintiff at the trial, and that is, because it interferes the least with the surrounding patents, as it takes in the least quantity of acres, and because, in cases of such vague description, the patentee should take the construction the least favorable to an extension of his grant. But the objection to this mode is the same as to that of the circle; the exterior line will not extend four miles in each direction from the plains, and it does not, like the circle, comport with any of the words in the description. The principle of location adopted by the judge at the trial, seems to correspond more nearly with the words of the grant. It goes four miles from the plains in each direction, and it may be said and understood well enough in common language which the patent intended to use, to be round the plains. The difficulties that might apply to this location, if the plains were of different positions and shapes, is immaterial, for we are to adopt a construction that will best comport with the subject matter before us, as it actually exists. The idea of rolling out the patent to the extent of four miles from every part of the plains, is literally impracticable, and when so modified as to be practicable, it would give too difficult, and inconvenient a shape for location, and in a case of a description vague and doubtful, it would be stretching the grant over all the surrounding patents to an unreasonable degree ; a construction more convenient and practicable, better answering the words of the grant, more favorable to the rights of the crown, and to the security of adjoining patents, ought to be preferred·

And it is not essential that we should absolutely decide which of the other modes of location ought to be preferred, since either of them would exclude the premises from the *Catskill* patent. If it was necessary, however, to adopt a specific location, I should incline to adopt the location which was preferred by the judge at the trial, as least liable to objection, and most comporting with the grant.

2. The next inquiry is as to the adverse possession set up by the defendant. In the first place, it ought to be observed, that the lessor of the plaintiff deduced a regular and complete title to the premises. The first decisive evidence of adverse possession in the defendant, was by the lease of 1784. The recital therein of a former lease cannot be evidence of such a lease, as against the plaintiff, and as to the prior possession by *Johannis* and *Abraham Van Gordon*, the credibilty of the testimony, as to the tenure of that possession, has been passed upon by the jury, and I see no good reason to question the correctness of their conclusion. On this point, I think the verdict ought not to be disturbed, and that judgment ought to be entered for the plaintiff.