[No. 1802.]

LINK, COUNTY TREASURER OF PARK COUNTY, v. JONES, COUNTY TREASURER OF JEFFERSON COUNTY.

1. BOUNDARY LINES—MAGNETIC VARIATIONS.

Where the boundary line of a county called to run "due south" to a certain point "thence south" to a river, the entire line should be construed as running due south according to the magnetic meridian, making allowance for the magnetic variation.

2. COUNTY BOUNDARIES—STATUTORY CONSTRUCTION.

Where a statute divides a territory into counties, the different sections of the statute each defining the boundaries of a county, the different sections are not to be construed *in pari materia* like different acts passed on the same subject, nor like a statute with many sections treating on the same subject, but the different sections are to be construed like patents or grants or segregations of different date where the older in time must be first satisfied and concludes the junior in case of conflict. So the boundary line of a county first established by a statute must control in case of conflict with a county whose boundaries are defined by a subsequent section of the same statute.

3. BOUNDARIES.

In the location of boundary lines, calls for natural objects and artificial monuments will always control courses and distances.

4. COUNTY BOUNDARIES—ERRONEOUS CALLS.

Where the west line of a county as defined by statute calls to run south from a well established point to a river, and another county defined by a subsequent section of the same statute begins at a well estab-

lished point on the same river several miles below the point where the west line of the former county if run south would intersect the river, and in closing the boundaries of the later county the statute calls for the west line of the former and thence south with said line to the river, thence up the river to the place of beginning, the words "up the river" should be rejected from the closing call and the call read as thence down the river to the beginning, rather than change the course of the west line of the former county so as to intersect the river at a point below the beginning point of the latter.

*Error to the District Court of Park County.*

Mr. AUGUSTUS PEASE and Mr. C. A. WILKIN, for plaintiff in error.

Mr. WM. A. DIER, for defendant in error.

BISSELL, P. J.

Why the possible dispute over these boundaries has lain dormant for nearly forty years and only thrust itself on judicial attention at the threshold of the twentieth century, is past comprehension. We assume without examination, since it is conceded by the contending governmental bodies, the suits were properly brought, and under the law can be maintained. The important thing in them is the end and a decision of the matter. To sustain the trial judge, or to seek for legal reasons by which his and our conclusions can be undeniably supported is relatively of slight consequence. No great injury could be done either county by an erroneous decision. The suit is peculiarly one wherein the old maxim *interest reipublicæ ut sit finis litium* applies with unusual force. A simple affirmance would be as valuable and useful as an affirmance supported by a discussion of the facts and upheld by irrefragable legal arguments. We could as justly and as well insist the learned trial judge proceeded wisely along the lines indicated by the authorities as to attempt to so demonstrate. But the statute commands us to write. We shall therefore, as briefly as we can, whether as to the facts or as to the law, state our conclusions.

In February, 1861, the territory of Colorado was organized. At the first session of the territorial legislature in the fall of that year it was subdivided into seventeen counties. The sections of the act which established the boundaries of Jefferson and Park counties are before us for construction. They are:

"Section 24. Jefferson county—commencing at a point where the township line between townships one (1) and two (2) south, intersects the range line between ranges sixty-eight (68) and sixty-nine (69); thence due west twenty miles; thence due south to the junction of North and South Clear creeks; then south to the Platte river; thence down the center of said Platte river to the point where said river intersects the first correction line; thence east to the point where said first correction line intersects the range line between ranges sixty-eight (68) and sixty-nine (69); thence north to the place of beginning."

"Section 30. Park County—commencing at a point where the second correction line south intersects the Platte river; thence south to the third correction line south; thence west to the summit of the snowy range, east of the Arkansas river; thence in a northerly direction along the divide between the Arkansas and Platte rivers, and around the head waters of the Platte river and its branches; thence easterly along the snowy range dividing the waters of the Platte from the waters of the Blue, to the point of intersection with the first correction line south; thence east on said correction line to the western boundary of Jefferson county; thence south on said boundary to the Platte river; thence up the center of said river to the place of beginning."

Boegel and Vermillion at some time became the owners of land, part or all of which was situate in either Jefferson or Park county as the boundaries of those counties were established. Each county claimed from them portions of the taxes assessed and they brought suit to obtain a judicial determination of their obligation. The two counties in some way which we have not examined were interpleaded, the

owners dropped out on the payment of the taxes into court, and Park and Jefferson counties remained as the respective litigants contending over the location of the boundary lines. The nub of the dispute is the location of the western boundary of Jefferson county. It is quite impossible without an unwarranted prolixity of statement to exhibit it as clearly as it appears to us from an inspection of the whole act and an examination of the maps which counsel have presented. Using a very apt and pointed illustration furnished by counsel for the defendant, for which we desire to give him full credit, we start out with the suggestion that at the time the act was passed the land within the limits of the territory was unorganized, undivided and largely unsurveyed. Most of it was an unknown, untraversed wilderness. It devolved on the sovereignty to divide this *terra incognita* into governmental subdivisions. They started practically as we start for the purposes of construction, with a map of the state clean and clear, and on that white surface proceeded to lay out the seventeen counties. They began with Costilla. With that starting point and with its lines and the boundaries of the territory as a base proceeded to construct and define the remaining sixteen. The twelfth county in the order of formation was Jefferson. There can be no dispute as to the starting point of the boundary of that county; none as to its north line, none as to its east or south lines and none as to its west, to the junction of North and South Clear creeks. These are all conceded and indeed could not on any theory of construction, location, or survey, be disputed. They are plainly determinable by fixed points and natural objects easily ascertained and practically irremovable. We then assume that the statute defining the county boundaries of the territory of Colorado, so far as regards its different sections, is in no sense to be looked at and construed *in pari materia* like different statutes on the same subject, or like a statute with many sections treating on one subject. The principle suggested is wholly inapplicable. Each section establishes the lines of a county. The map is to be constructed by the proc-

ess of elimination or exclusion. As fast as one county is laid out, the land included in its limits is to be treated as segregated from the whole or the balance, and none thereby included can be taken to be included or to be intended to be included in the subsequent creations, unless no construction is possible save one which shall in some degree disturb what has been laid out. Under some circumstances we might be compelled to vary an apparently established line to work out the inclosure of the whole territory within specified lines. This is speculative purely, for there is no such necessity. Eleven counties were created. Jefferson was laid out; it was followed by Clear Creek and Gilpin and then Park was defined. In stating its boundaries and *termini* the dispute will come in sight and we can, after the narration, better proceed with the case.

The starting point of Park is without the possibility of mistake. It begins where the second correction line intersects the Platte river. It runs south to the third correction line, west to the summit of the Snowy range now known as the Mosquito, which is east of the Arkansas, along this divide to its intersection with the first correction line; thence east on this line to the western boundary of Jefferson. Thus far we have no trouble. Points and lines are definite, certain, unmistakable. We are furnished monuments which control all other descriptions, courses or distances. If this western boundary of Jefferson be ascertainable, we still have no difficulty. But Park's eastern boundary to the length of this line is by statute made coincident with it. The statute says, "thence south on said boundary," (of Jefferson) to the Platte; "thence up the river to the place of beginning." But if we have run the western boundary of Jefferson from the forks of North and South Clear creek south to the Platte, according to the terms of section 24 which created it, then when we run the eastern boundary of Park to the Platte, according to the call along the western boundary of Jefferson, we can run "thence to the place of beginning," but we cannot according to the call of the statute go "thence up the

center of the river to the place of beginning," for from the point at which, run south, the western boundary of Jefferson strikes the Platte, it is some dozen or more miles down the river to the fixed point at which the legislature started Park's boundary lines. " Thence *up* the center of the stream;" on this call Park county bottoms this appeal. If there be any legal principles which control the construction of this language, or if the call can be rightly construed to mean "thence to the point of beginning," rejecting the language "up the center of the river," then the case is relieved of all difficulty and the judgment of the court below was right and should be affirmed. The first inquiry is, what is the proper construction of the language of the section establishing Jefferson county, "thence south to the Platte river." Does this mean due south, according to the magnetic needle or is the line thereby left so indefinite that we may swing it far enough east of south to strike the river below the starting point of Park's boundary, and thereby so conclude the description of this last county that we can from the end of its eastern line run thence "up the river" to the place of beginning?

The legal propositions suggested by this statement and argument are on the authorities to which our attention has been called amply supported and they fully accord with our views of the law. Stating these propositions in a measure sequentially for the purposes of the opinion, the cases are agreed to the point that the description in the location of Jefferson county "thence south to the Platte river" starts and runs a line from the junction of North and South Clear creek due south to the Platte river. We see no force in the suggestion that because the line from the northwest corner of Jefferson to the junction of North and South Clear creek is run due south and the continuing line is expressed "thence south" furnishes a presumption that the line is to run otherwise than due south or south on a magnetic line from that junction to the Platte river. The cases lay it down as a general proposition that wherever a line is run southerly or south, or due south, the result is precisely the same and the line thus

stated in a description is to be taken as run due south unless there is some other thing in the description which compels or permits another course in order to work out the description which the grantor has put in a deed or whereby a legislature has fixed the boundaries of a county. It was held in the New Hampshire case, and we think very properly, that wherever a line in a grant is stated as running due south or due north or south or north, it is to be taken as south or north according to the magnetic variation. If this principle be adopted in this state, then whenever a line is run south, it is to be taken as run south according to the magnetic variation of the needle in the locality to which the description is applicable. In any event it would be run due south by the sidereal or astronomical meridian if not by the magnetic. The New Hampshire case held that the courses of a deed are to be run according to the magnetic meridian unless something appeared in the terms of the grant or otherwise to indicate that the astronomical and not the magnetic meridian was to be observed. We think this rule is properly applicable in Colorado and ought to be adopted by the courts. It is well known that in all surveys made by the government in subdividing the state and running meridians and correction lines, section lines, or subdivisions of sections, the magnetic meridian is adopted. This is true in the location of all mining claims and all such lines are thus run and this is usually so stated. It ought therefore to follow that where a line is run without the statement of the magnetic variation, it should be assumed to be run with an observance of it unless there be some statement to the contrary. We therefore hold in accordance with the authority which we cite that when the legislature stated the western boundary of Jefferson county and ran the line south from the junction of North and South Clear creeks it ran a line due south making allowance for the magnetic variation, and it must strike the Platte river at the point where that line thus projected would strike the stream; *Wells v. Jackson Iron Mafg. Co.*, 42 N. H. 235; *Brandt v. Ogden*, 1 Johns. 156 · *Jackson v. Reeves*, 3 Caines, 293; *Cur-*

*rier v. Nelson et al.*, 96 Cal. 505. Either determination of the direction of this line would probably answer for the purposes of the decision and we shall assume the court's findings with reference to the location of the land or the running of the line as entirely correct under the testimony, accepting those conclusions without any further examination of them.

There are two or three other considerations which are equally determinative of the correctness of the judgment. We have already suggested that the sections of the statute were not to be construed like different acts passed on the same subject to which the rule of construction *in pari materia* would be applicable, and we conclude that the two sections are to be construed like patents or grants or segregations of a different date where the older in time necessarily concludes. It was held in the case cited from Caines that the older patent must be first satisfied whenever the older and the junior come in conflict. This principle would, if this rule be correct, require first the determination of Jefferson county's boundaries and the inclusion therein of all territory which its lines would embrace, and the exclusion therefrom of all territory which would otherwise be embraced within the lines of Park county. There is another rule applied in the determination of boundaries which is to our mind equally conclusive of the claims and contentions of Park county. We are bound in determining where those lines are to be run to look first to the natural objects and artificial monuments which will always control courses and distances. Monuments and natural objects being ascertainable and irremovable, must be observed and they overcome the force and effect of any course or distance named in the description. Nearly all the authorities to which we shall subsequently refer, as well as those already cited, adopt this doctrine. This being true, we must ascertain first whether there are any natural objects or permanent monuments stated in the descriptions of either of the counties which will control the courses and distances. This is self-evident from the reading of the statute. So far as concerns Jefferson county, we have the forks of North and South Clear

creek, and we have the Platte river, both natural objects, both permanent monuments. We have under the authorities run a line due south according to the magnetic variation from the junction of North and South Clear creek to the Platte river. The ends of the two lines being given, the direction being established, we have a line connected by two natural objects run in a fixed direction under the law. We have been thus particular in stating this line because the line itself, being thus established becomes thereunder a fixed boundary with reference to the description of Park county. The lines of a location known as Hart's location and a grant have been held to be a natural object for the purpose of the boundary. *Land Co. v. Saunders*, 103 U. S. 316; *Owings et al. v. Freeman et al.*, 48 Minn. 483; *White v. Luning*, 93 U. S. 514; *Johnson v. Bowlware*, 149 Mo. 451; *Shepard v. Nave et al.*, 125 Ind. 226; *Yanish v. Tarbox*, 49 Minn. 268; *Cragin v. Powell*, 128 U. S. 691. Accepting these decisions as declarative of the law the results which we have already foreshadowed and the positions which we have already stated, are amply supported and control the controversy. The lines of Jefferson county were first established and this portion of the public domain of the territory must be included within its boundaries. The legislation resulted in fixing a line due south from the forks of North and South Clear creek to the Platte river, which being thus run became a permanent object or a natural monument by which the subsequent description of Park county must of necessity be controlled and measured. It will be remembered that the starting point of Park county is a natural corner on the Platte river from the northwest corner of a previously established county. It was run due south to a correction line which is a public survey of which we are bound to take judicial notice and by which all descriptions are governed and controlled. It was run west to the top of a range, "thence north to a line established by a public survey;" thence east to a fixed object, to wit, the western boundary of Jefferson county, and thence south along that line to the Platte river. When once we accept that line as an estab-

lished proposition and a natural object by which the Park county boundaries are to be determined, there is no question whatever but what it must control all courses and distances and be regarded as the eastern boundary of Park county. It was likewise a controlling part of the description of Park county because that line is what is known in the law as an adjoiner and wherever there is a discrepancy in the description, the adjoiner always governs. *Airey v. Kunkle*, 190 Pa. St. 196.

We thus have under all these authorities and under all the different principles which they declare and the rules which they have laid down in the determination of boundaries of property several controlling rules, any one or all of which fix and determine the eastern boundary of Park county. It is quite manifest from the statute and from what has already been stated if the section describing Park county had said at the conclusion of the description of Park's eastern boundary, " thence to the place of beginning," there would have been absolutely no trouble or possibility of dispute. The sole difficulty comes from the use of the words, " thence up the river to the place of beginning." Subsequent knowledge and subsequent surveys and information probably not possessed by the legislature when the counties were created or the state was subdivided, show the cause of the mistake. There was little knowledge as to the exact location or description or course of the Platte river, and this want of information led it to believe that continuing the boundary line of Park county from the termination of the western boundary of Jefferson would compel a course up the river instead of down the river to the place of beginning. However this may be, the principles already declared by the courts and referred to and followed, compel us to reject the words " up the river " and read the call " thence to the place of beginning," instead of " thence up the river to the place of beginning." The right to do this and the rule of construction which permits it, seem to be as well established as those to which we have already adverted, *Simpkins, Admr., v. Wells*, 42 S. W. Rep.

348; *Warden v. Harris*, 47 S. W. Rep. 834. These authorities are direct to the proposition and in seeming accord with the principles laid down in the other cases. Assuming this to be the law, and it is certainly well established in matters of description contained in grants and patents and surveys, we hold that it is our right and our duty, and the court below did not err when it rejected the words "up the river" but proceeded to draw the line from the junction of the western boundary of Jefferson county with the Platte river to the point of beginning which is a fixed object. Thus and thereby the apparent intention and purpose of the legislature will be accomplished, the boundary lines of the two counties be firmly and fully established and the county authorities of the contending governmental subdivisions of the state will be advised as to their duty and be able to act intelligently in the assessment of taxes, the imposition of other burdens, or the performance of the duties which the various statutes have laid on them.

We believe the learned judge who tried the case did not err and that his conclusion accords with the law, is a correct interpretation of the statute, and the dispute between the counties has been correctly adjudged.

Finding no other error in the record which is urged and of sufficient consequence to disturb the judgment, it will therefore and necessarily be affirmed.

*Affirmed.*