47   235
66   269
68   371

HENRY B. WELLS v. JACKSON IRON MANUFACTURING COMPANY.

The caption of depositions must state that the adverse party did or did not object, even if he did not attend, and it is not sufficient to state that he attended on a subsequent day to which the caption was adjourned and one deposition taken, and did not object.

The statement that all the deponents but W. appeared on the 12th of April, and W. on the 13th of April, and that each separately and severally made solemn oath, &c., shows with sufficient certainty that each took the proper oath.

An answer to the question, "please state what you know about the deed hereto annexed" which proceeds to prove its execution, is not open to the objection that it was not taken upon interrogations.

Questions are not leading which ask if witness is or is not acquainted with any of the signatures of certain deeds, and whether in his opinion certain signatures are, or are not, genuine.

A deed of land from the grantee of a collector of taxes, conveying the title so derived, even if but a quitclaim, would be color of title, and an entry under it would give possession of the whole tract described.

A practical location of land is but an actual designation by the parties, upon the ground, of the monuments and bounds called for by the deed.

A survey of land and the erection of some monuments, with the view of a subsequent conveyance, cannot be admitted to vary or control the deed afterwards made, when that deed calls for none of the monuments so erected and contains no reference to such survey.

All prior negotiations must be taken, so far as the construction of the deed is concerned, to have been merged in that instrument; the conclusive presumption being that the whole engagement of the parties, and the extent and manner of it, were reduced to writing.

Whether the title under which the plaintiff claimed covered the summit of Mt. Washington or not, an entry upon it by his grantor would give him such a seizin as to enable him to maintain a writ of entry against one who showed no evidence of title.

The authority to take a deposition is sufficiently shown by proof that the person taking it was an *acting* commissioner or notary public.

A request of the witness to state what he knows in reference to the execution of a "paper enclosed," purporting to be a deed, is not a leading question.

But it is a loose practice to found an interrogatory upon a paper merely "enclosed," and, at least, ought not to be encouraged.

Where, upon the filing of such deposition, the deed said to be enclosed is accidentally and not fraudulently omitted, the deposition ought not for that reason to be excluded.

The tract of land known as Sargent's Purchase may properly be taxed although uninhabited.

If uninhabited, it was not necessary to post within its limits an advertisement of a sale of the land for taxes.

Where the original papers relating to the sale of lands for taxes, filed in the clerk's office, are destroyed by fire, their contents may be proved by any secondary evidence, where the case from its nature does not disclose the existence of other and better evidence ; and *it is not in such case necessary that the record should be made up anew*, under the direction of the court, and copies only used.

Such records are not proper recórds of the court, but they are merely deposited in the office of the clerk.

Where a single sum is assessed upon an unincorporated place, the treasurer's warrant is a *list*, within the meaning of the statute.

The certificate of the deputy secretary upon the copy returned by him to the collector, is competent evidence of. the time of filing and return.

The clerk of an auction sale for taxes may become a purchaser.

If a portion of Sargent's Purchase had, by an act of the legislature, been annexed to the town of Jackson, what remained would constitute Sargent's Purchase, and would be liable to the proportion of public taxes assigned by law to that location.

An allotment by place *may* indicate with certainty the location of each and every lot, although no lot lines had in fact been run, and if the lots could be made certain, that would be sufficient.

The court will take judicial notice of the fact that a certain person was Governor of the State, at a given period, and also of the genuineness of his signature.

In New Hampshire the courses in a deed are to be run according to the magnetic me·ridian, unless there be something in the instrument showing that a different mode is intended.

A different mode will not be inferred from the fact that in giving the courses of the several lines, there is prefixed to the course of part of them, the word "due," as thence "due west," or "due north ;" the word "*due*" in this connection meaning merely *exactly* north, or *exactly* west, and it applies with equal propriety to these points, whether the magnetic or the siderial meridian be referred to. It must be considered as part of the common law of the State that the courses in deeds of private lands are to be run according to the magnetic meridian when no other is specially designated.

The actual intention of the parties, or the surveyor, is not admissible to affect the construction of the deed.

WRIT of entry, dated July 10, 1860, for a tract of land "being part of a tract of land known as Thompson and Meserve's Purchase, in said county, but not within the limits of any town, and bounded as follows : "Beginning at the northwest corner of Pinkham's Grant, so-called, in said county ; thence north 8 degrees west to the southerly line of Low and Burbank's Grant, so called ; thence southwesterly on the line of said Low and Burbank's Grant, to the northeast corner of the tract known as Jeremiah Chandler's Purchase ; thence south 1 1-2 degrees west on the easterly line of said Chandler's Purchase, 800 rods ; thence south 88 1-2 degrees east to the west line of said Pinkham's Grant ; thence northerly on the westerly line of said Pinkham's Grant to the place of beginning.

Also one other piece or parcel of land, with the appurtenances, situate in said county of Coos, and being all that tract of land called and known as Thompson and Meserve's Purchase, containing 12,000 acres.

Plea, the general issue, "as to parcel of the demanded premises, to wit : all that tract of land called Sargent's Purchase, containing 25,000 acres," "bounded on the north by a line commencing at the northwest corner of said Sargent's Purchase at a spruce post marked N. W. C. S. P. †, and witnessed by two spruce trees marked † 1863 ; and from thence running due east to a small hemlock tree standing in the west line of Green's Grant marked † Sargeant, and witnessed by a spruce and a hemlock tree, each marked † 1863." "And as to all the residue of the said demanded premises, the said Jackson Iron Manufacturing Company say that they cannot render the said residue, because they say that they are not and were not" "tenants as of the freehold of the said residue."

Replication, as to that part of the plea whereof the defendants put themselves on the country the plaintiff doth the like—"and as to that part and so much of said plea as disclaims a part of the demanded premises, the plaintiff accepts the same."

The chief matter in controversy was the title of the summit of Mount Washington. The plaintiff claimed it as owner of Thompson and Meserve's Purchase ; the defendant claimed it as owner of Sargent's Purchase. Whether plaintiff owned Thompson and Meserve's Purchase, whether defendant owned Sargent's Purchase, and whether Mount Washington was in the former or the latter Purchase, were questions in dispute.

After the trial had continued several days, the case was withdrawn from the jury by consent, for the purpose of determining all the questions of law raised by the rulings *pro forma*, of the court during the trial. When these questions are determined the case is to be discharged.

The plaintiff introduced the following eight items of evidence to show a paper title :

1. A resolution of the Senate and House of Representatives of New Hampshire, approved June 22, 1831, [Laws 1831, page 40, chapter 51,] authorizing and empowering the Governor, by and with advice and consent of the Council, to appoint a land commissioner, to be sworn, and to continue in office during the pleasure of the Executive for the

time being, whose duty it shall be to advertise and expose to sale such public lands as he may think proper, and to sell and convey any lands belonging to the State lying south of 45 degrees north latitude, for such consideration as to such commissioner the interest of the State may seem to require, and to execute deeds thereof, which deeds, being first recorded in the office of the Secretary of State, shall be effectual for conveying all the right and title of the State to such land, saving the right of jurisdiction, provided that all the expenses of surveying and conveying such lands shall be paid by the grantees.

2.   Copy of the proceedings of the Governor and Council nominating James Willey of Conway, as land commissioner, June 27, 1831, and appointing him July 1, 1831.

3.   Commission of said Willey as "land commissioner pursuant to a resolve of the legislature passed June 22, 1831, hereby giving and granting unto you all the power and authority given and granted by said resolve," to hold said office "during the pleasure of the Executive," dated July 2, 1831, with a certificate that said Willey took and subscribed the oath of office as a land commissioner, Sept. 3, 1831.

4.   Copy of quitclaim deed, James Willey, land commissioner, to Samuel W. Thompson and George P. Meserve, dated July 8, 1835, acknowledged Aug. 3, 1835, received in the office of the Secretary of State, Sept. 10, 1835—consideration $500—conveying "the following tract of public land, viz : beginning at the northwest corner of Pinkham's Grant, thence running westerly by the south line of Shelburne Addition and the south line of Low & Burbank's Grant to the northeast corner of Jeremiah Chandler's Grant ; thence due south on the east side line of said Chandler's Grant so far that a due east line extending to the west line of said Pinkham's Grant shall contain 12,000 acres ; thence northerly on said west line to the first bound."

The defendants objected that this copy could only be used in a chain of title.   The plaintiff undertook to render it competent by showing a chain of title, and the court allowed the copy to be read.

5.   Quitclaim deed—Samuel W. Thompson to John Bellows, dated and acknowledged May 28, 1858, received April 27, 1860—consideration $20—conveying "the Thompson & Meserve Purchase, being the same tract of land sold and conveyed to the said Thompson and George P. Meserve by James Willey, land commissioner for said State, by deed dated July 28, 1863."

6.   Quitclaim deed—George P. Meserve to John R. Hitchcock, dated and acknowledged May 11, 1854, received May 24, 1854—consideration $500—premises described as in the Willey deed.

7.   Quitclaim deed—J. R. Hitchcock to John Bellows, dated May 12, acknowledged May 13, 1854, received Sept. 25, 1854—consideration $500—premises described as in the Willey deed.

8.   Quitclaim deed—John Bellows to plaintiff, dated and acknowledged July 28, 1859, received Aug. 10, 1859—consideration $800—premises described as in the Willey deed.

The plaintiff then introduced the three following items of paper title :

1.   Copy of quitclaim deed—Samuel W. Thompson and George P.

Meserve to Daniel Eastman, dated and acknowledged Feb. 1, 1839, received May 19, 1840—consideration $500.   Description—"Beginning at the southwest corner of Daniel Elkins' land formerly owned by Joseph Hanson, thence running due west one mile ; thence northerly parallel to Pinkham's Grant about three miles to Low & Burbank's Grant; thence westerly by said Low & Burbank's Grant to the northeast corner of Jeremiah Chandler's Grant; thence due south on said Chandler's Grant so far as that a due east line extending to said Pinkham's Grant shall contain 10,000 acres ; thence due east to said Grant; thence northerly on said Grant to the first bound, it being a part of a tract of land which we purchased of James Willey, land commissioner of said State, on the 28th day of July, A. D. 1835, as his deed of that date will more fully show."

2.    Copy of warranty deed—Daniel Eastman to George A. Whitney and John Wetherell, dated and acknowledged May 7, 1840, received May 18, 1840—consideration, $500—of premises described in said deed Thompson & Meserve to said Eastman.

3.    Quitclaim deed—George A. Whitney, John G. Wetherell, Chas. Faulkner and Anne S. Faulkner to plaintiff, dated Dec. 8, 1858, acknowledged by first three grantors Dec. 9, 1858, by the fourth grantor Dec. 13, 1858, received Dec. 23, 1858—consideration $550—conveying all the grantor's title to the tract of land known as Thompson & Meserve's Purchase, "our title and interest in said premises being derived under a deed from Daniel Eastman to John Wetherell and George A. Whitney, recorded with the records of deeds of Coos county, book 31, pages 542, 543, and under a deed from Joseph C. Cady to said Wetherell and Whitney, also recorded with the records of deeds of said county, to which reference is hereby made.

To prove the signatures of the grantors and witnesses of said deed, and that they were out of the State, and to prove the death of said John Wetherell, and that his only children were John G. Wetherell and Anne S. Faulkner, plaintiff introduced the depositions of ·Charles Faulkner, John E. Parker, F. F. Saxton, M. Day Kimball, Geo. A. Whitney, Thos. E. Whitney, Frank P. Dunlop, Theo. N. Fogue, Charles G. Wood.    Said depositions were taken by a commissioner in Boston, and were annexed to one caption, which certified that personally appeared before the commissioner all of the deponents except Geo. A. Whitney, "on the 12th day of April, A. D. 1864, and the within named George A. Whitney on the 13th day of said April," "and each separately and severally made solemn oath that the within deposition by him subscribed contains the truth," etc ; "and the taking of the same was begun at ten of the clock in the forenoon on said twelfth day of said April, and continued until five of the clock in the afternoon, when the first eight of said last mentioned depositions in their within order were completed. An adjournment was thereupon had until four of the clock in the afternoon of said thirteenth day of said April, and said taking was then resumed and continued until the whole was completed ; the deposition of said George A. Whitney was taken on said last mentioned day.   The said Jackson Iron Manufacturing Company was duly notified," etc.,

"but was not present at the taking upon said twelfth day of said April; when said taking was resumed as aforesaid upon said thirteenth day of said April, the aforesaid company defendant was present by Amos B. Merrill, its attorney, and did not object."

The defendant objected to this caption.

1. That it does not appear that defendant did or did not object on the 12th day of April, when the defendant did not appear.

2. That when Merrill appeared April 13, though it appears that said Merrill did not object, it does not appear that defendant did not object to the caption.

3. That it does not appear that all the deponents swore to the truth of their respective depositions before the commissioner.

The said deposition of Thos. E. Whitney was as follows:

Int. 1. "Please state what you know about the deed hereto annexed.

Ans. George A. Whitney was my uncle. I know his handwriting. The signature upon the deed hereto annexed purporting to be that of George A. Whitney is genuine. The signature of T. E. Whitney upon said deed was written by me; it is my signature. I saw George A. Whitney sign said deed. I have seen Fanny Davis write. I think the signature of Fanny Davis upon said deed is genuine. Fanny Davis resides in Boston."

The defendant objected that this deposition was not properly taken on interrogatories. The court allowed the deposition to be read, and defendant excepted.

A part of said deposition of Geo. A. Whitney was as follows:

Int. 2. "Are you or are you not acquainted with the signatures of any of the grantors or witnesses to the deed here produced?

Ans. I am.

Int. 3. Which of the signatures are you acquainted with?

Ans. I am acquainted with the signatures of George A. Whitney, who was my father, of T. E. Whitney and Fanny Davis. I have seen them all three write many times, and am well acquainted with their signatures.

Int. 4. State whether in your opinion the signatures of George A. Whitney, of T. E. Whitney, and Fanny Davis, upon the deed here produced and hereunto annexed are or are not genuine.

Ans. They are genuine. They are their signatures."

Said interrogatories 2 and 4 were objected to by defendant at the caption and at the trial as leading and incompetent. The court allowed interrogatories and answers 2 and 4 to be read, and defendant excepted.

The plaintiff then introduced the following two items of a tax title:

1. Deed—Charles Bellows, sheriff and collector for.1846, to Joseph C. Cady, dated and acknowledged Jan. 18, 1848, received April 17, 1852—consideration $20.71. Description, the whole of one undivided half in common and undivided in an unincorporated, unorganized place called Thompson and Meserve's Purchase, one half of said tract having been paid on or before sale by George P. Meserve; the said Joseph C. Cady being the legal bidder and purchaser of the residue unpaid on, being one undivided half of the whole of Thompson and Meserve's Pur-

chase, in said county, at a public vendue legally notified and holden at the Coos hotel, in Lancaster, in said county of Coos, on the 26th day of December, 1846, for the collection of non-resident taxes assessed by the treasurer of said county for the year 1844, by his warrant dated May 25, 1846, and returnable on or before the first day of January, 1847, with warranty that the said Charles Bellows had conformed to the law, and that as sheriff and collector he had good right, as far as that right might depend upon the regularity of his own acts and proceedings, to sell and convey the same.

2.   Quitclaim deed—Joseph C. Cady to John Bellows, dated and acknowledged Jan. 18, 1848, received April 17, 1852—consideration $20.71—premises, one half of Thompson & Meserve's Purchase in common and undivided.

Defendant objected to the admission of the last two deeds.

1.   That they were a source of title different from what had been before introduced.

2.   That they were quitclaim deeds.

3.   That they were defective tax titles.

4.   That their execution was not proved.

The court allowed the deeds to be put in evidence and defendant excepted.

It was agreed that said Willey was dead.

Samuel W. Thompson, a witness called by plaintiff, testified as follows, the parts included in brackets being subject to defendant's exception :

Am one of the grantees in the Willey deed—Willey and I went to Sargent's Corner on Rocky Branch—he showed me the corner on Rocky Branch, in Sligo—from there we went to Hart's Location—saw no line —went on a westerly course to the Bartlett road—he had a compass and took observations—went on the road to Fabyan's—took observations on the road to Fabyan's—then went to Pinkham road, followed it up and took similar observations—[our object was to ascertain the amount of land among the mountains and between the Crawford Notch road and the Pinkham road, and having found that, and knowing the amount of land granted, we could easily determine what was ungranted.]   Afterwards he and I went to the Gorham line—found Low & Burbank's line and followed it eight miles west—then turned a south course [till he said he had run far enough to give me 12,000 acres—he said there was probably more ungranted land south of that, but he would go no further so as to be sure not to convey any to me that had been before granted to others.]   There we piled up rocks for a monument—then took an east course, and down through Tuckerman's Ravine and down to Green's Grant—he had his compass and ran the south line by compass—think the south line ran about a mile to the south of the summit of Mt. Washington—went to the Pinkham road—the Willey deed was made soon after—after the deed was made I went on the premises to look after trespassers—the tract was mostly rocky and bare but some timber—went on once with the intention of building a mill on the north branch of Pea-

body river—paid taxes till the conveyance to Eastman—[when we conveyed to Eastman our talk was that he was buying Mt. Washington.]

On cross-examination the witness testified as follows : Don't recollect any line from the Dorcas Merrill lot—ran with compass over to Hart's Location—found a corner and plain line at Gorham line—Willey spoke of that line—can't tell whether we ran west on the Gorham line—we ran southwesterly or westerly course on Low & Burbank's line—don't know whether Low & Burbank's line came up to the corner where we began there—didn't measure the distance—Willey said about eight miles—then turned south—he said he was going to run a due south course—I don't know anything about the distances—we passed over a spur of the mountain west—think the east spur—went south far enough to make 12,000 acres, and then went east, calculated exactly east to Pinkham road—were two days—think eight or nine miles from Rocky Branch to Crawford Notch—passed over a spur of Crawford Mountain, or somewhere there—trees to the top—west side barren and steep—from corner where we commenced Willey kept up his compass and sights—got down to the road south of Abel Crawford's—left Sawyer's Rock at the left, about one half mile south—came out about one-half mile above Hart's ledge—staid at Abel Crawford's all night—next day went up to Fabyan's—Ethan Crawford kept there—then went back in stage—next day went up Pinkham road to Perkins' with horse and wagon—from there went up Pinkham road—Perkins nine miles from Glen house—think Hanson lived at Glen house, and several others—stopped at Daniel Pinkham's all night, at upper part of opening, on the north side of the Peabody river—the night before staid at Jackson City—this was very near, just before the time we took the deed—next day after staying at Pinkham's went home—went back again in a few days to Perkins' with horse, and then on foot to Pinkham's—staid at Pinkham's all night—went out early next morning—carried provisions, a compass, compass staff, chain and hatchet—commenced I think about one half mile or so north of Pinkham's house this way on the road he was building—where we began we found a line across—can't say whether any corner there—Willey said it was Low & Burbank's line—can't tell whether one half mile or a mile from Pinkham's—the growth was hemlock and spruce—from the road to the line was a little uppish, not very steep—followed the line I thought seven or eight miles—didn't find the line all that distance—line perhaps one third or one half of the way and then used the. compass—Willey kept me ahead—think one third or one half of the distance was in growth—Willey set his compass very often—I set no flag staff—I was pretty prominent myself—last of the growth rather thick—crossed no streams of any amount—very dry season of the year —mountainous—some places very difficult to get up it—went on a westerly course—went over rocks and struck timber again—don't know Carroll corner—no corner at the north west corner till we made it—no large timber there—camped out all night, a mile perhaps east of the corner—then went south far enough to take 12,000 acres—west line some in growth and some out—had been fires about there—the north west corner I think on Mt. Adams—going south we passed over gulf and head

of streams flowing into the Ammonoosuc, west of the summit of Mt. Adams—some trees in the ravines, out of them barren—at the south west corner it became smoother—came out through Tuckerman's Ravine—on the south line we came due east by compass to Pinkham road, Peabody river after sunset—on the south line went from one bluff to another by compass as well as we could—crossed at an angle over Tuckerman's Ravine—didn't go to the Crystal Cascade—followed a compass course from one bluff to another—followed the Crystal Cascade stream some—came out on Pinkham road east of the Cascade, three fourths of a mile down the stream from the Cascade—staid that night at Perkins', four miles from where we came out on the road.

Ditect examination resumed—at Sargent's corner saw a marked tree—started to find Low & Burbank's line.

The testimony of this witness also tended to show that these proceedings of Willey & Thompson were after negotiations between them for the sale, and a few days before the date of the Willey deed, and that the object of their proceedings was to ascertain and fix the bounds of the land to be conveyed, and that after these proceedings an agreement was made with Meserve that he should be a grantee in the deed.

Plaintiff then introduced the testimony of Samuel F. Spalding and Jona. J. Davis, tending to show John Bellows' possession of Mt. Washington at various times between 1851 and 1859, and there rested his case.

Defendant moved for a nonsuit on the ground that the grant of Thompson & Meserve's Purchase in the Willey deed was of a definite tract of land, which could be made certain by a survey; that there were no measurements by Willey or Thompson; that it is entirely uncertain whether the land around which they walked would include the demanded premises; that the grant was made without reference to the boundaries actually fixed by Willey and Thompson; that the description in the Willey deed is on Low & Burbank's line to Chandler's Purchase; that there is no evidence that Willey and Thompson went to Chandler's Purchase; that the west line in the deed is the east line of Chandler's Purchase due south so far that a line running due east would include 12,000 acres; that there was no evidence concerning Chandler's Purchase; that the conveyance was by courses and distances, and they must be taken as in the deed, although there were monuments on the ground not run to or by in the deed.

The court overruled the motion for a nonsuit and defendant excepted.

Defendant introduced the following items of paper title:

Copy of Quitclaim deed—James Willey, land commissioner, to Jacob Sargent *et al.*, dated and acknowledged May 31, 1832, received in the office of the Secretary of State, June 5, 1832—consideration $300—conveying "a certain tract of public land in said State, and county of Coos, and described as follows, viz: Beginning on the northeast corner of a lot of land given to widow Dorcas Eastman of said Bartlett by the legislature of New Hampshire, thence running due west 3 1-4 miles; thence due north so far as that a due east course extending to the west line of the town of Jackson or Pinkham's Grant, shall contain

25,000 acres; thence southerly on said westerly line of Jackson to the southwesterly corner thereof; thence south so far as that a due west course shall strike the first mentioned bounds—excepting 150 acres which I have sold Otis Eastman, belonging in said described premises, as his deed will more fully show; and if any of the above described premises have heretofore been granted by authority of said State, they are to be reserved out of the same, and as many acres annexed on the northerly end of the above described tract adjoining Pinkham's Grant."

2. Deed—George P. Meserve, sheriff, to Jared W. Williams, dated and acknowledged Jan. 18, 1844, recorded Feb. 7, 1844: "Know all men by these presents, that I, George P. Meserve, of Jackson, in the county of Coos and State of New Hampshire, sheriff of said county of Coos, and collector of taxes for the year 1841, on unincorporated place, in said county, having so few inhabitants as to be incapable of choosing town officers, do by the virtue of the authority in me vested by the laws of this State, and in consideration of twenty-one dollars and twenty-eight cents, to me in hand paid before the delivery hereof by Jared W. Williams, of Lancaster, in the county of Coos and State of New Hampshire, hereby sell and convey to him the said Jared W. Williams, his heirs and assigns, the whole of the unincorporated and unorganized place called Sargent's Purchase in said county of Coos, except lot No. 6 in the 3d range, the west half of the same, lot No. 22 in the 2d range, the undivided half of the following lots No. 10 and 18 in the 1st range, Nos. 12 and 18 in range 2, and Nos. 1, 13 and 19 in 3d range, and 12 in 4th range, and Nos. 6 and 12 in range 5th redeemed, and lots numbered 20 in 2d range, 18 in 4th range, 18 in 5th range—paid before sale; the said Jared W. Williams being the legal bidder and purchaser of the same at a public auction, legally notified and holden at the Coos hotel in Lancaster, in said county of Coos, on the 10th day of January, A. D. 1843, for the collection of non-resident State taxes assessed by the treasurer of the State for the year A. D. 1841. To have and to hold the said premises with the appurtenances, to him the said Jared W. Williams, his heirs and assigns forever. And I, the said George P. Meserve, do hereby covenant with the said Jared W. Williams, that in making sale of the same in my said capacity, I have in all things conformed to the directions and requisitions of the law in that behalf provided, and that as sheriff and collector aforesaid, I have good right as far as that right may depend upon the regularity of my own acts and proceedings to sell and convey the same in manner aforesaid."

3. Quitclaim deed—Jared W. Williams to George M. Herring, dated, acknowledged and received July 27, 1844—consideration $150—same description as in the last deed.

4. Quitclaim deed—George M. Herring to George P. Meserve, dated and acknowledged April 9, 1846, received May 5, 1846—consideration $100—same description as in the last deed, "and the west half of said lot No. 6 in the 3d range of lots in addition."

5. Quitclaim deed—George P. Meserve to Samuel D. Coues and David Pingree, dated and acknowledged Sept. 16, 1846, received Sept. 21, 1846—consideration $140.26—same description as in the last deed.

6. Quitclaim deed—Samuel E. Coues and David Pingree to defendant, dated and acknowledged by Coues, Nov. 18, 1853, acknowledged by Pingree Oct. 25, 1855, received Oct. 27, 1855—consideration $1,000—of the land conveyed by the last deed.

To prove the execution of said last deed, defendant introduced the depositions of Charles De Selding, James O'Donnell, Geo. W. Green, and the testimony of E. S. Coe.

There was no evidence of the genuineness of the signature of Sarah De Witt, one of the witnesses to the signature of Coues. The deed was put in evidence subject to plaintiff's exception. Subject to plaintiff's exception, interrogatory and answer 1 of De Selding's deposition were read as follows :

Int. 1. Where did you reside in November, 1853, what was then your business or profession, and what appointment, if any, did you then hold under the authority of the State of New Hampshire.

Ans. I resided in the city of Washington in 1853, and was then a commissioner of deeds, notary public, and held various other appointments. I was duly commissioned by the Governor of New Hampshire, and officiated as a commissioner in virtue of the authority granted by the commission sent me, and under which I acted.

Int. 2 of De Selding's deposition was as follows : Please state what you know in reference to the execution of the enclosed paper which purports to be a deed from Samuel E. Coues and David Pingree to Jackson Iron Manufacturing Company, and which is dated Nov. 18, 1853.

Ans. 2 referred to a deed enclosed.

Plaintiff objected that this interrogatory was leading, and that no deed was annexed to or enclosed with the deposition. The court overruled the objection and plaintiff excepted. The last part of answer 2, relating to witness, was objected to and omitted.

Int. and Ans. 2 in O'Donnell's deposition, were objected to for similar reasons. That part of answer 2 relating to Green was omitted.

To Int. and Ans. 2 of Green's deposition, plaintiff objected that, although it referred to a deed enclosed, no deed was enclosed. Defendant then offered to prove that the deed was sent to Washington, and returned to defendant enclosed in De Selding's deposition ; that the deed was then sent to Portland, and returned to defendant enclosed in O'Donnell's and Green's depositions. Plaintiff did not require proof of those facts, but objected that when the depositions were filed and notice given to plaintiff that they were filed under the rule, the deed was not filed with the clerk and never had been filed. The court overruled this objection and plaintiff excepted.

Defendant then introduced the following evidence to sustain his tax title :

1. An act of the legislature, Laws, November session, 1840, ch. DLXXX, p. 501, approved Dec. 23, 1840, to raise by taxation $60,000, and directing the treasurer to issue his warrants, etc.

2. The court was satisfied by the testimony of Pinkham and Benton that all the records, books and papers relating to tax titles which were in the office of the clerk of the courts of Coos county, January, 1848,

were burned, and that none of said papers returned to said office before 1848, are now in said office.

3. Copies of the New Hampshire Patriot of Oct. 13, 20, and 27, 1842, containing the following notice :

State of New Hampshire, Coos ss. Public notice is hereby given to the proprietors and owners of land in the following townships, locations and grants, in the county of Coos, that so much of said townships, locations and grants, will be sold at public vendue at the Coos hotel at Lancaster, in said county, on Tuesday, the 10th day of January next, at ten o'clock in the forenoon, as will satisfy the several warrants issued against said townships, locations and grants, by the treasurer of said State, for the following State taxes raised by an act of the legislature of said State, passed Dec. 23, 1840, and entitled, "An act to raise sixty thousand dollars for the use of the State, to be assessed, collected and paid into the treasury on or before the first day of December, A. D. 1841," and incidental charges, unless prevented by previous payment, to wit :

| | Tax. | Warrants. | Total. |
|---|---|---|---|
| Bean's Purchase, | 2.40 | 1.00 | 3.40 |
| Crawford's Purchase, | 60 | 1.00 | 1.60 |
| Chandler's Purchase, | 60 | 1.00 | 1.60 |
| Dixville, over three fourths paid, | 7.80 | 1.00 | 8.80 |
| Sargeant's Purchase, | 1.20 | 1.00 | 2.20 |
| Success, 22 cents paid by S. Hall of Portsmouth, | 12.60 | 1.00 | 13.60 |

GEO. P. MESERVE, Sheriff.

Jackson, Sept. 17, 1842.

4. Copies of the Coos County Democrat of Oct. 4, 11, and 18, 1842, containing the same notice.

5. George P. Meserve testified as follows, that part of his testimony in brackets being subject to plaintiff's exception :

Was appointed sheriff of Coos county, May 31, 1839, and served five years. [Sold Sargent's Purchase Jan. 10, 1843—in the spring of 1842 I had a warrant from the State treasurer—I copied it and sent the copy to the office of the deputy secretary in the first of the session of the legislature of 1842—I had made sales before and sent this copy within the time required by law—sent copy by a member of the legislature—after Sept. 1, 1842, I received the copy back with a filing on the back of it stating the time when the deputy secretary received it and when he returned it to me ; that he received it before the 8th day of the session and that nothing had been paid.]

After I received the copy September, 1842, I made copies of notice like those in the Patriot and Democrat, and posted one at Cady's hotel, in Lancaster, this side of the bridge, soon after the date of the notice—posted another, and I think two, on Sargent's Purchase, which was not an inhabited place—sent one to the Patriot and one to the Democrat—posted up about same time as sent to newspapers—the notice at Cady's was taken down the day of sale, and on that day a certificate was made and sworn to on the back of it, of the time when it was put up

and taken down—before sale I appointed in writing J. W. Williams, clerk, and he accepted, was sworn and acted as such—his appointment and oath were recorded in a book of records which I had—commenced sale in forenoon—land sold in afternoon—sale closed before 6 P. M.—before sale I made calculation of cost, and put Sargent's Purchase up for sale to the one who would pay the tax and costs for the least number of acres—I offered it in that way—stating the tract, amount of taxes and costs, and that any one could have it who would pay that amount for the least number of acres—think something had been paid to me on Sargent's Purchase—sold it to Jared W. Williams in that manner—the whole tract except what had been paid on—this is the deed I gave Williams, and I think it states the true consideration paid. Next day after the sale we copied the record of sale and filed the copy with the Patriot and Democrat, and all other papers, with the clerk of the court—all done the next day, I think—kept the record of sale and filed it with the clerk of court, two, or three or four years after the sale.

[In consequence of an act of the legislature requiring all such papers and records to be filed,] this is a duplicate notice of the sale, and I think it is one of the two which I posted upon Sargent's Purchase, (this copy of notice was put in evidence and was like those in the newspapers,) the original warrant from the State treasurer went back to him.

On cross-examination the witness gave the following testimony, that part in brackets being subject to defendant's exception :

I sold all the unincorporated tract of Sargent's Purchase—did not sell all of Sargent's Purchase—a part of it had been annexed to Jackson in 1837—the treasurer's warrant was against Sargent's Purchase—Willey is dead.

[Last of August, 1853, Willey told Barker (defendant's surveyor and witness) that the locality where the maple and ash were on Rocky Branch was the southeast corner of Sargent's Purchase—that he fixed that as the southeast corner of Sargent's Purchase—that he ran a line west from that corner by his compass for the south line of Sargent's Purchase—that he ran nearly two miles or something like that.]

I posted notice on Sargent's Purchase on spruce tree in the woods—there was some summer travel to the top of Mt. Washington, by report—that is the most public place in Sargent's Purchase, if it is in Sargent's Purchase—did not post a notice there.

This notice (the one produced) was taken down Nov. 4, 1842—took down the other one on Sargent's Purchase and filed it with the clerk of court—don't recollect going there but once to take them down—I gave receipts for payments and made a minute of them—don't recollect whether I made return on the warrant of the amount of money paid me before the sale, or for what lots or by whom they were paid—can't tell who paid me on any of the lots before sale—think Stevenson paid for somebody on some—these lots were named and excepted at the sale—t hink I never saw the old plan—suppose my return on the warrant is in the office of the Secretary of State.

[Am and have for many years been a surveyor—always used the compass meridian—have traced old lines and town lines in that country near

and about Sargeant's Purchase—never traced a polar line—never found one.]

Direct resumed.

The maple and ash are said to be the northwest corner of the Dorcas Merrill lot—saw no line running east of the maple—the clearing of that lot went nearly up to that tree—in 1842 and 1843 no house on Mt. Washington, I think—in October, 1842, should think there were no visitors to top of Mt. Washington—might be some scattering ones.

Cross resumed. Think I was not at the top in 1842—think there was before that a pile of stones on the top piled up as high as my head.

Direct resumed. Think there were never any lots lotted by survey on Sargent's Purchase, west of Jackson, only on paper.

Cross resumed. Willey said he made a plan and on it an allotment of the lots.

Plaintiff made the following objections in writing to defendant's title. The court overruled these objections and plaintiff excepted :

The premises being uninhabited as well as unincorporated, they were not subject to taxation in the manner and by the authority they were taxed in this case.

It appears by the testimony of the sheriff making the sale, that the State treasurer's original warrant to him ordering the collection of the tax on which the premises were sold, with his doings thereon, was deposited by him in the office of the treasurer aforesaid, and the loss of such original warrant was not shown nor attempted to be shown, nor was it produced nor a copy of it, nor was any evidence produced that such warrant ever existed, or of its contents, except the verbal testimony of said sheriff, testifying from recollection.

It did not appear that said sheriff delivered to the clerk of the court of Common Pleas within ten days, or at any time, an account of the sale, with the charges of the sale, under oath, nor did it appear that he delivered said clerk the advertisement posted up in the place where the lands lie with an affidavit that it was so posted up.

It did appear that the notices posted up by said sheriff in the place where the land taxed lies were taken down by him on Nov. 4th, 1842, and that the sale was January 18, 1843. It appeared that Jared W. Williams was the clerk of the sheriff in making the sale and that he bid off the land at the sale, and that it was deeded to him.

There was no evidence furnished from the records of the deputy secretary of State that the sheriff sent a certified copy of his list of the taxes to the deputy secretary on or before the 8th day of the June session, 1842, nor that such copy was ever returned to such sheriff by the deputy secretary, except the oral testimony of said sheriff, nor any evidence of search among such records for such evidence, or of the destruction or loss of the same.

It appeared that a portion of the tax was paid before sale, but it did not appear in any way how much was paid. It also appeared that the land was sold for a portion only of the tax, but it did not appear what portion.

The evidence shows that Sargent's Purchase entire was sold except

lots No. 20 in the 2d range, 18 in the 4th range, and 18 in the 5th range. But the sheriff's deed conveyed a less quantity of land than that sold, to wit, less by the west half of lot 6 in the 3d range, 22 in the 2d range, and undivided halves of 10 and 18 in range 1, 12 and 18 in range 2; 1, 13 and 19 in range 3; 12 in range 4; 6 and 12 in range 5, as being redeemed after the sale and before the deed. The deed should have been of all sold, as there could be no redemption of a part without redeeming the whole.

The deed is void for uncertainty as there is no evidence of Sargent's Purchase ever being allotted.

The sale of Sargent's Purchase as such was void because several thousand acres of the same had been previously annexed and made a part of the towns of Jackson and Bartlett, and taxed within the limits of said towns—all having been sold together, and the assessment of the tax is void for the same reason.

Under the evidence the sheriff could not legally except the lots he did in the offer to sell—there being no allotment of the purchase.

The sale is void because the sheriff exacted from, offered for sale and sold a part of the land for the entire tax—a portion of it having been paid on and a portion included in the towns of Jackson and Bartlett.

If the record returned to the clerk of the court of Common Pleas was destroyed, the defendant should have had the record made up. Evidence of it could not be given as submitted in this case. The law required the evidence of the sale to come from the clerk's office.

It does not appear that the notice was posted in the most public place on said Purchase.

Because copy of warrant and not list of taxes was sent to the deputy secretary's office.

No evidence that a list of the land not redeemed was placed in the county clerk's office within ten days after the sale or at any time.

To show the bounds and location of Sargent's Purchase, defendant introduced a resolution of the legislature of New Hampshire, authorizing the State treasurer to convey to Dorcas Eastman a tract of land beginning at an ash tree on the north of Rocky Branch, so called, by land granted to Sylvanus Emery; thence south 82 degrees east 100 rods; thence north 8 degrees east 160 rods; thence north 82 degrees west 100 rods; thence south 8 degrees west 160 rods to the bounds begun at, containing 100 acres.

DAVID LAWRENCE MORRILL.

Approved, July 4, 1826.

Plaintiff objected that this resolution did not appear to be approved by the Governor. The court overruled the objection and plaintiff excepted.

Subject to plaintiff's exception defendant introduced a resolution of the legislature, approved June 16, 1824, granting land to Daniel Pinkham on condition that he build a road, the land to extend one half mile from the road on each side, from Adams (now Jackson) to Durant, (now Randolph.) Also copies of grants to Rogers, Wentworth, and Treadwell, to Green and to Martin.

Noah Barker was a witness called by defendant, and the court was satisfied that he was an expert in surveying and entitled to give his opinion as such. He gave the following testimony, that part in brackets being subject to plaintiff's exception :

In 1853 and 1854, employed by David Pingree, surveyed Sargent's Purchase and other adjoining tracts. Surveyed the Dorcas Merrill (same as Dorcas Eastman) lot according to the grant and according to the actual location of it—surveying it according to the grant, I started from a point shown me by John Emery and by Hardison L. Emery, (who is dead, and who lived on the next lot down the branch)—that point is on Rocky Branch from 60 to 80 rods above her buildings—there was no bound or mark there—there was a pine stump a few feet from it cut many years ago and scored into—I marked the stump as a witness —from that point I ran south 81 degrees east by needle 100 rods, thence north 9 degrees east 160 rods, thence north 81 degrees west 100 rods, thence south 8 degrees west to place of beginning—taking that as the Dorcas Merrill lot according to the description in the grant, and starting from the northeast corner of it, I surveyed Sargent's Purchase according to the description in the grant, using a meridian of longitude as a due north and south line, and marked trees and bounds all round Sargent's Purchase—the south line was 3 1-4 miles and the west line 11 miles, 76 chains and 4 links—the north line to Green's Grant was 4 miles, 15 chains and 87 links—these bounds made 25,000 acres, excluding 150 acres for Eastman tract—the ground was so rough I had to triangulate some.

[Triangulating is as accurate as measuring by chain—commenced about middle of June, 1854, was at work July 4th—had five or six men —lived on the ground except one day—made plans afterwards.]

The Tip-Top house, on the summit of Mt. Washington, is about 9 3-4 miles north of the south line thus run—and the north line about 2 miles north of said house—made monuments all around the tract thus surveyed. In 1861 I found what was called the north line of the Dorcas Merrill lot as located and occupied—the northwest corner was a rock maple tree about 4 rods east of Rocky Branch—in 1863 I chained this north line and found trees with ancient spots—cut out chips—the line was marked before 1832—traced that line to within few rods of where we made a corner—there was nothing where the corner should be— there had been fires and new growth—they had cleared near to the maple tree—from that tree I found a spotted line 1 mile and 53 chains, extending nearly to Bald Ledge—this line was north 81 degrees west in 1853 —in 1863 I found the needle there 1-4 degree, (and perhaps more,) further west than in 1853—I made out this line to be due west by the polar meridian, calculating from the north star—the maple and ash, of which Meserve testifies, are the northwesterly corner of the Dorcas Merrill lot as located—I did not find the original northeast corner as located —found a line up to within few rods of it—this northeast corner is one hundred rods from the maple tree.

On cross-examination Barker testified as follows, the parts in brackets being subject to defendant's exception :

After running on the Willey line in 1853 I abandoned it—could not start from the maple and make out Dorcas Merrill's lot—[went with Meserve to Willey, and Willey described the maple tree to me as the corner of the lot—Meserve was there as agent of defendant, and said he had been there before and had known where it was—Willey said in making the Sargent grant he ran the marked line with a compass—that he commenced at the maple by Rocky Branch and ran west to Bald Ledge, where he could see Mt. Washington, and found 3 1-4 miles would extend beyond Mt. Washington—that he had trouble with his needle, and his son was sick, and he never returned to finish the survey—we run all lines by compass—I understand by "north," north by the needle, but by "due north," north by the polar meridian, and Gibson, Flint, and other authors on surveying, treat it so. In 1853, near the corner of Dorcas Merrill lot, the meridians varied 9 degrees—and on the west line of Sargent's Purchase, in places, they varied more—in some places could not depend on the needle—if the grant had been "north" and "west" and not "due north" and "due west," I should have surveyed by the magnetic meridian of 1832—the meridian of longitude does not vary—the magnetic meridian does vary.

I made my surveys of Sargent's Purchase in 1854, independent of the line run by Willey. The variation of the meridians at the Glen house in 1863, was 11 1-2 degrees—in one place in Maine, in 1847, I found the variation to be 16 degrees, 38 minutes—and between Canada and Maine in July, 1850, 15 degrees, 16 minutes—those variations are much higher than the average—taking the average variation of all Maine and New Hampshire, from extreme northeast to extreme southwest, perhaps the average might be from 11 degrees to 12 1-2 degrees.

Loomis' book shows the following variations in Maine : Farmington, 11 degrees, 20 minutes ; Dixfield, 12 degrees ; Waterville, 12 degrees, 8 minutes ; Raymond, 9 degrees, 45 minutes ; Umbagog Lake, 13 degrees ; Rumford, 11 degrees ; Belfast, 13 degrees ; West Thomaston, 12 degrees ; and the following in other places : Hanover, N. H., 9 degrees, 15 minutes ; Burlington, Vt., 7 degrees, 36 minutes ; Williamstown, Mass., 6 degrees, 15 minutes ; Dorchester, Mass., 9 degrees, 6 minutes ; one place in Georgia, 5 degrees east ; New Haven, Ct., 6 degrees, 10 minutes ; Champlain, N. Y., 9 degrees, 30 minutes ; Albany, N. Y., in 1826, 6 degrees, 14 minutes ; Albany, N. Y., in 1831, 6 degrees, 32 minutes ; Detroit, Mich., 3 degrees east. All but the last two are west—there is a line through North Carolina, Pennsylvania and Ohio, where the meridians are one and the same—west of that line the variation is east—east of that line the variation is west—the general rule is that the farther you go north and east the greater is the variation, and the further south and west the less it is. In going north to make the west line of Sargent's Purchase, I allowed 1 minute to a mile for increased variation, which is the rule and practice. To find the polar meridian, observation of the north star must be taken. (The witness described the manner of taking such observations.)

The maple was marked "S. 1832," with spots on the east and west sides—starting from the maple and running by the magnetic meridian,

it is my impression, but I am not certain, that the top of Mt. Washington would not be in Sargent's Purchase.

I ran the Dorcas Merrill lot by compass because "due" was not in her grant—that lot had been located a few years before 1832.

Alexander Wadsworth testified, the part in brackets being subject to plaintiff's exception :

Live in Boston—been a surveyor 38 years—[in running a line "due north" I should run on a line of longitude, and for "due west" should run at right angles on a parallel of latitude—should ascertain the true north by the north star—never ran a line by the meridian of longitude, nor calculated the difference between the meridians.]

Defendant then introduced evidence tending to show possession of Mt. Washington in defendant since 1853.

It was agreed that the Dorcas Merrill lot had been located and occupied before 1832 by bounds essentially varying from those described in the grant.

Defendant claimed that the first bound mentioned in the grant of Sargent's Purchase was the northeast corner of the Dorcas Merrill lot, as located at the date of the Sargent grant, and that the meridian of longitude should be used in surveying Sargent's Purchase.

Plaintiff claimed that said first bound was the northwest corner of said Merrill lot as located at the maple tree, because Willey had fixed and located it as said first bound and had run a line westerly from it as a part of the south line of Sargent's Purchase—that the line so run by Willey was the south line of Sargent's Purchase as far as it went—that the remainder of the south line should be run west at right angles with the magnetic meridian—and that the west and north lines of Sargent's Purchase should be run by the magnetic meridian.

On these points the court ruled in favor of plaintiff and the defendant excepted.

All the depositions, papers and plans used at the trial may be referred to in argument.

### Amendment to Case.

Plaintiff also offered to show, that, at the date of said grant to Sargent and others, said Willey, in writing said deed, used the word "due" with reference to the magnetic meridian, and that the only method of surveying land, then known or practiced in this State, was by the magnetic meridian, and that the word "due" as then used in describing land boundaries applied uniformly in this State to the magnetic meridian. The court rejected this evidence and plaintiff excepted.

Above amendment allowed.

*Binghams*, *Benton & Ray*, for plaintiff.

*Burns & Fletcher* and *Heywood*, for defendant.

BARTLETT, J.   The copy of the deed from Willey was properly received as part of the plaintiff's chain of title.   *Harvey* v. *Mitchell*, 31

N. H. 582. The first objection to the caption of the depositions of Charles Faulkner and others is well taken, as it does not state whether on the 12th of April the defendant did or did not object; *Rand* v. *Dodge*, 17 N. H. 355; but we think the other two objections are unfounded as the caption explicitly states that the defendant was present on the 13th and did not object, and it shows with sufficient certainty that each of the deponents took the proper oath.

The objection that the deposition of George A. Whitney was not properly taken on interrogatories seems without foundation in fact; and the exceptions to the second and fourth interrogatories must be overruled, for neither of them, upon any fair construction, is leading, and certainly it was competent for the plaintiff to prove the genuineness of the signatures, and the answer to the third interrogatory shows the witness qualified to give his opinion.

We are unable to appreciate the force of the objection that "the deeds from Charles Bellows to Cady, and from Cady to John Bellows, are a source of title different from what had been before introduced," for we see nothing in the fact that the plaintiff has set up a claim under conveyances from Thompson and Meserve to prevent him from showing a tax title also, if he has acquired such, or from relying on mere possession. The deed Cady to Bellows is said to have been a quitclaim, but that furnishes no legal ground of objection to its admissibility, and it would be color of title, even if the deed from Charles Bellows conveyed no interest to Cady; *Minot* v. *Brooks*, 16 N. H. 374; *Rand* v. *Dodge*, 17 N. H. 343; and an entry by a grantee under such a deed would give him possession of the whole tract described in it. *Tappan* v. *Tappan*, 31 N. H. 53; *Gage* v. *Gage*, 30 N. H. 425. As these deeds were offered as part of a chain of title, and appeared by official certificates upon them to have been regularly recorded, it was unnecessary to prove their execution. *Bellows* v. *Copp*, 20 N. H. 502; *Knox* v. *Silloway*, 1 Fairf. 202; 1 Green. Ev. sec. 571, n.

A practical location is but an actual designation by the parties upon the ground of the monuments and bounds called for by the deed. *Clough* v. *Sanborn*, 40 N. H. 316; *Colby* v. *Collins*, 41 N. H. 304; *Peaslee* v. *Gee*, 19 N. H. 274; 4 C. & H.'s Phil. Ev. 549; *Jenks* v. *Morgan*, 6 Gray 448; *Cleaveland* v. *Flagg*, 4 Cush. 76; *Kellogg* v. *Smith*, 7 Cush. 382; *Knapp* v. *Marlborough*, 29 Vt. 282. The testimony of Thompson did not tend to show a practical location of the land conveyed by Willey's deed. The transaction he states was not a designation of the monuments, &c., called for by that deed, for the deed was not then in existence; *Sanborn* v. *Clough*, *Peaslee* v. *Gee;* and the prior negotiations must be taken, so far as the construction of the deed is concerned, to have been merged in that instrument, "the conclusive presumption being that the whole engagement of the parties, and the extent and manner of it, were reduced to writing." *Nutting* v. *Herbert*, 35 N. H. 121; *Cook* v. *Combs*, 39 N. H. 597; *Galpin* v. *Atwater*, 29 Conn. 97; *Parkhurst* v. *Van Cortland*, 1 Johns. Ch. 282; *Clark* v. *Northy*, 19 Wend. 323; 4 C. & H.'s Phil. Ev. 519. The deed contained no reference to any monument established by Thomp-

son and Willey, or to any survey by them, (*Sanborn* v. *Clough*, 40 N.
H. 239,) and the effect of the evidence at most could be merely to show
that Willey and Thompson intended a different tract of land from that
afterwards conveyed by the deed, if the lines of their exploration are
found to differ from the calls of the deed; and its reception to control
the deed would be in violation of a principle quite elementary. *Bell* v.
*Morse*, 6 N. H. 208; *Furbush* v. *Goodwin*, 25 N. H. 426; *Dean* v.
*Erskine*, 18 N. H. 83; *Clough* v. *Bowman*, 15 N. H. 514; *Cook* v.
*Babcock*, 7 Cush. 526; *Curtis* v. *Francis*, 9 Cush. 421; *Knapp* v.
*Marlborough*, 29 Vt. 282; *Linscott* v. *Fernald*, 5 Greenl. 426;
*Flagg* v. *Thurston*, 13 Pick. 150; *Allen* v. *Kingsbury*, 16 Pick.
235; *Dawes* v. *Prentice*, 16 Pick. 435; *Pride* v. *Lunt*, 1 Appl. 115.

Besides, Meserve who was one of the grantees in the deed was not a
party to this transaction by Willey and Thompson, and there is no evi-
dence that he ever authorized or ratified it. *Prescott* v. *Hawkins*, 12
N. H. 27. This evidence was therefore incompetent to affect the con-
struction of the deed; and it does not tend to show that the summit of
Mt. Washington is within the tract conveyed by it, as there is nothing
in the testimony of Thompson tending to show that the westerly line,
over which they passed, was on the easterly line of Chandler's Grant;
and although the subsequent entry by Thompson under the deed gave
possession of all the tract conveyed by it, yet there is no evidence that
Mt. Washington is part of that tract.

But the motion for a nonsuit was properly denied, for the case finds
that the evidence of Spalding and Davis tended "to show John Bellows'
possession of Mt. Washington at various times between 1851 and 1859,"
and this is evidence of his seizin as against the defendant, for at the
time of the motion no evidence of title in the defendant appeared;
*Rand* v. *Dodge*, 17 N. H. 343; *Wendell* v. *Blanchard*, 2 N. H.
456; *Woods* v. *Banks*, 14 N. H. 113; *Jones* v. *Merrimack Co.*, 31
N. H. 384; *Parker* v. *Brown*, 15 N. H. 185; *Lund* v. *Parker*, 3
N. H. 50; *Graves* v. *Amoskeag Co.*, 44 N. H. 464; *Straw* v. *Jones*,
9 N. H. 402; *Sparhawk* v. *Ballard*, 1 Met. 95; and the deed from
John Bellows to the plaintiff would give the latter such seizin as would
enable him to maintain this action against one who showed no evidence
of title. *Edmunds* v. *Griffin*, 41 N. H. 532; *Tappan* v. *Tappan*,
36 N. H. 120; *Carter* v. *Beals*, 44 N. H. 413; *Ward* v. *Fuller*,
15 Pick. 185.

If it was necessary under the statute to prove the handwriting of both
of the subscribing witnesses to the signature of Coues, in order to show
that his title passed, (see *Cram* v. *Ingalls*, 18 N. H. 616, *Melcher* v.
*Flanders*, 40 N. H. 156,) still no objection is suggested to the proof of
the execution by Pingree, and the deed was admissible to show the con-
veyance of his interest to the defendant.

Parol proof of the appointment and commission of Selden would seem
incompetent, but it was quite sufficient to show him an acting commis-
sioner or notary. *Bellows* v. *Copp*, 20 N. H. 503; *Prescott* v.
*Hayes*, 42 N. H. 56; *Forsaith* v. *Clark*, 21 N. H. 422. The sec-
ond interrogatory in Selden's deposition is not leading, and the objection

that no deed was enclosed seems not sustained in fact. Had objection been taken to the regularity of that mode of taking depositions, it is unnecessary now to say whether it ought to have been sustained. Obviously the practice of founding an interrogatory or answer in a deposition upon a deed merely "enclosed" is very loose and not to be encouraged, as, aside from its inconvenience, it might open a wide door for fraud or mistake; see *Brown* v. *Clark*, 41 N. H. 245; but no question upon this point has been reserved.

There is nothing tending to show that the deed was fraudulently or intentionally withheld when the depositions were filed; and as an examination of the depositions would have given the plaintiff notice as to the deed, so that he might have procured an order for placing it on file, if it ought to have been filed, and need not have suffered by the omission, we see nothing in the mere circumstance of the neglect to file the deed, that should exclude the deposition. Besides the depositions seem to have been filed under the twenty-sixth rule of court for the purpose of limiting the adverse party in the time and manner of objecting to the caption; and in such case the only effect of a failure by the defendant fully to comply with that rule would seem to have been a failure to obtain the restriction of the plaintiff under the rule.

Numerous questions have been raised in reference to the evidence of a tax title introduced by the defendants, but several of them have not been argued by counsel, and may possibly not arise or may be obviated upon a trial of the cause; and upon the merits of some of these we have not deemed it advisable to pass at this time.

Sargent's Purchase, though uninhabited, might properly be taxed, *Wells* v. *Burbank*, 17 N. H. 393, *Russell* v. *Dyer*, 40 N. H. 173, Laws 1831, p. 26, Laws 1805, p. 448, and was made liable to a tax by the legislature. Laws November, 1840, p. 173. In *Wells* v. *Burbank*, 17 N. H. 394, it was decided that "it is not necessary to post an advertisement of a sale for taxes in an unincorporated place, which is uninhabited;" and we do not understand the authority of this case upon that point to have shaken by any subsequent decision. *Russell* v. *Dyer*, 42 N. H. 399. We do not now see any sufficient reason for overruling the case in that particular. It cannot, as in *Russell* v. *Dyer*, 40 N. H. 184, be presumed that the legislature did not intend to subject such an uninhabited place to the statutes relative to taxation, since this and other similar places have for many years been specially named in our statutes as objects of taxation, and the taxation without the power of collection by sale would seem futile; so that upon a careful comparison of the objects and provisions of the statutes in question here, with those considered in *Russell* v. *Dyer*, as well as in reasons of public policy, we find sufficient grounds for a distinction between the latter case and *Wells* v. *Burbank*. Under these circumstances, as the doctrine of *Wells* v. *Burbank* does not seem likely to work any real practical injustice, and as it is probable that a very considerable number of titles to real estate acquired during the twenty years since the decision in that case was made, and while it has been unquestioned by the court and undisturbed by legislation, may depend upon the rule there laid

down, we should deem it our duty under the law not now to question its correctness unless for more cogent reasons than appear to exist, in cases under the acts in question ; Broome Leg. Max. sec. 109, *et seq.*; Fearne on Rem. sec. 134; and we must, therefore, regard the authority of that case as decisive here. If, therefore, Sargent's Purchase was uninhabited, it was unnecessary to post any advertisement of the sale within its limits, and it would be immaterial where upon the Purchase, or when the notices were put up or taken down, or whether they were ever returned to the clerk's office. The original warrant was returned to the State treasurer, and as nothing further appeared, its contents could not properly be proved by parol. If the loss of the record in the clerk's office was shown, its contents could be proved by parol, certainly so far "as the case does not from its nature disclose the existence of other and better evidence." 1 Greenl. Ev. sec. 509 ; *Scammon* v. *Scammon,* 33 N. H. 59 ; *Forsaith* v. *Clark,* 31 N. H. 418.

As the sale was in January, 1843, and the Revised Statutes did not take effect till the following March, (Rev. Stat. p. 474, sec. 1,) we are to look to the statutes in force prior to the Revised Statutes for the provisions to govern the proceedings. By the statute then in force the sheriff was required to deposit with the clerk the lists and other papers containing evidence of his proceedings in the sale of lands for taxes, and it was made the duty of the clerk to receive and preserve them, and to make and certify copies thereof as of other papers on file in the office. Act Dec. 16, 1824 ; Laws 1830, p. 572. As the statute requiring the deputy secretary of the State to retain in his office a certified copy of the list returned to the collector was not in force at the time of these transactions, (Laws 1847, ch. 495,) we need not inquire whether in case of the loss of the original, resort should be had to that before introducing parol evidence. See 1 Greenl. Ev. sec. 84, & n ; 4 C. & H.'s Phil. Ev. 285 ; *Melvin* v. *Marshall,* 22 N. H. 382.

As already stated, upon proof of the loss of the originals in the office of the clerk, their contents may be proved by any secondary evidence, where the case from its nature does not disclose the existence of other and better evidence, and we do not find that any exception in the case of records like these is made by the common law or by our statutes ; and therefore the plaintiff's objection that "the record should have been made up anew under the direction of the court," &c., and that the record so made up would be the only competent evidence, cannot be sustained. He does not cite any authority for his position, or point out any law or show any usage requiring such a renewal of the record ; and it is to be observed that the records so deposited in the clerk's office are not proper records of the court itself, for they are not made by its officers as such, and do not contain its transactions ; they are merely deposited in the office of the clerk ; so that we see nothing in the nature of the case that should require what neither the common law nor our statutes have prescribed, nor any well settled usage established.

Where a single sum is assessed upon an unincorporated place, the treasurer's warrant is a list within the meaning of the statute, *Wells* v. *Burbank,* 17 N. H. 407 ; *Homer* v. *Cilley,* 14 N. H. 100 ; and if a

copy of it was duly returned by the collector, this was a sufficient compliance with the second section of the act of July 4, 1829 ; Laws 1830, p. 564 ; and the certificate of the deputy secretary upon it was competent evidence of the time of filing and return ; *Wells* v. *Burbank*, 17 N. H. 409 ; *Smith* v. *Messer*, 17 N. H. 430 ; and this having been destroyed, its proof would fall within the rule already stated.

The evidence tends to show that the sheriff, within ten days after the sale, delivered to the clerk a copy of his sale, but there is no evidence that it was accompanied by his charges according to the provision of section 4 of the act of 1829, Laws 1830, p. 565 ; that section, however, does not provide that the account of the sale shall be under oath, nor have we found any such requirement prior to the Revised Statutes ; Rev. Stat. ch. 4609 ; but under the act of 1829 the copy of the sale was to be attested.

As Meserve testified that on the day after the sale he filed with the clerk a copy of the record of sale, "with the Patriot and Democrat, and all other papers," the jury might have found that within ten days after the sale he so filed the copy of his list, if that were essential ; but it may not be altogether clear that this is required by the statute. Section 4 of the act of 1829 only provides for the filing of "an attested copy of the sale," with charges of sale, within ten days after the sale, and section 7 makes it the duty of the collector to lodge with the town clerk, within ten days after the sale, the newspapers containing the advertisement of such sale, and the advertisement which may have been posted up in such town with a certificate accompanying the same, under oath that it was posted up according to law, which advertisement and certificate shall be recorded by the town clerk, and a certified copy of such record shall be deemed sufficient evidence of those facts in any court of law ; and the said newspapers shall be kept on file by the clerk. The act of July 1, 1831, Laws, p. 26, gave the sheriff in a case like this, "the same power and authority with respect to the taxes committed to him to collect, which collectors of towns have or may from time to time by law have with respect to the taxes of non-residents ;" and provides that "he shall observe the same directions as collectors of towns are or may from time to time be bound by law to observe in collecting the taxes of non-residents," &c. ; with a proviso requiring an advertisement in the shire town of the county, as well as in the place where the lands lie. The first section of the statute of Dec. 16, 1824, enacted "that the lists returned by the receiver of non-resident taxes and other papers containing evidence of the proceedings of any former or future sheriff of any county in this State, relating to sales of land by him as sheriff, for State and county taxes, be deposited in the office of the clerk of the Superior Court," &c. ; and that it "be the duty of the said clerk to receive and preserve the same, and to make and certify copies thereof as of other papers on file in said office ;" and the second section provided that such copies might be used as evidence in courts of law in all cases in which the originals might be used," and with the "same force and effect." Laws 1830, p. 572. And in *Wells* v. *Burbank*, 17 N. H. 410, it is decided that the act of July, 1831, did not repeal this act of 1824.

The eighth section of the act of 1829 relates merely to lands redeemed. These would seem to be all the provisions of the statute upon the subject then in force.    The act of 1831 only provides what the sheriff shall file, and when he shall file it, by reference to other laws.    The act of 1824 seems to be the only statute at that time requiring the list to be filed with the clerk of the court, and it contains no express provision as to the time ; while the act of 1829, which is the only statute fixing the time for filing the papers by the collector, does not appear to include the list ; and as the land might be redeemed within one year from the sale by a tender to the collector, (Laws 1830, p. 565, sec. 4,) it may admit of a doubt whether the copy of the list was required to be filed with the clerk within ten days after the sale ; but it is unnecessary now to decide this question.

Besides, it is not entirely certain that the neglect of the sheriff after the sale seasonably to file a copy of his sale, or his list, or the list of lands redeemed, should defeat the title of a bona fide purchaser acquired under a previous sale legally made to him, where such purchaser has himself been in no fault; see *Smith* v. *Messer*, 17 N. H. 428 ; *Smith* v. *Bradley*, 20 N. H. 120 ; *Scammon* v. *Scammon*, 28 N. H. 432 ; *Pierce* v. *Richardson*, 37 N. H. 310, 312 ; *Hayes* v. *Hanson*, 12 N. H. 290 ; *Cardigan* v. *Page*, 6 N. H. 193 ; *Tucker* v. *Aiken*, 7 N. H. 113 ; *Pinkham* v. *Murray*, 40 Me. 587 ; *Lane* v. *James*, 25 Vt. 481 ; *Taylor* v. *French*, 19 Vt. 49 ; *Sumner* v. *Sherman*, 13 Vt. 609 ; but we do not propose to pass upon this question at the present time.

The clerk at the auction was not an officer making or in any way controlling the sale, and we see no legal objection to his becoming the purchaser.

It is said that a part of Sargent's Purchase was annexed to Jackson in 1837.    If chapter 336 of the Laws of that year is referred to in this statement, that fact does not appear on the face of the act which merely establishes the location of certain lines of the town.    If, however, the effect of that statute was as stated, then the part so annexed would thereafter, for purposes of taxation, cease to be part of Sargent's Purchase, and become part of Jackson, and liable to taxation as part of that town ; and the residue of the original purchase would for such purposes remain Sargent's Purchase, precisely. as in the case of any town in the State, after a farm has been severed from it and annexed to an adjoining town ; and the apportionment of Dec. 22, 1840, Laws, p. 499, which fixes the proportion of Sargent's Purchase at two cents for each thousand dollars to be raised by the State, must be taken to mean Sargent's Purchase as it existed for purposes of taxation, in the same way as it denoted the towns and other places as they legally existed, or might exist, for such purposes.    Whether, in the absence of any statutory provisions, the objection that the deed included less than was sold, could avail between these parties, we have not inquired ; for by the sixth section of the act of 1829, it is provided that when two or more persons are interested in any tract of land so sold, every individual may redeem his own part thereof by paying or tendering his proportion of the taxes

and cost for which the said land was so sold, and this proportion shall be according to the number of acres in the tract of land sold.    Section fourteen provides that when any estate of non-residents shall be sold by virtue of this act, and the money necessary for the redemption thereof shall not have been paid or tendered within one year from the sale thereof, the collector shall then execute a good and sufficient deed of such estate to the purchasers of the same, &c. ; and it prescribes the form of the deed with covenants that the collector has conformed to the requirements of the law in making the sale, and that as collector he has "good right, so far as that right may depend on the regularity of his own proceedings, to sell and convey the same in manner aforesaid." Laws 1830, p. 567.    The collector, then, is to execute a deed of what has been sold and not seasonably redeemed, and if he excepted from the conveyance those lots redeemed within the year, he seems to have followed the statute, for although they had been sold, yet as they had been seasonably redeemed, they did not come within the description of the fourteenth section, while the residue of the land sold did.    If any one of those interested in the tract had paid his proportion before the sale, his share was properly omitted in the sale.    Laws 1830, p. 565, sec. 3.    The objection that they sold the whole of the original Sargent's Purchase, including the parts on which the taxes had been paid, and the part annexed to Jackson, if there were such, does not seem very clearly supported by the case, for such a fact is by no means necessarily to be inferred from the evidence stated, which is at least quite as susceptible of a different interpretation.

Whether upon Meserve's testimony that he sold "the whole tract except what had been paid on," naming and excepting the lots upon which payments had been made, and stating "the tract and the amount of taxes and costs," in connection with his deed, after proof of the loss of the records, the jury could have found that the taxes had been paid for the lots excepted from the sale, and that the residue had been sold for the remainder of the taxes and costs ; or whether it was necessary to show these facts more specifically, so that the amounts paid for each portion, the number of acres in each of such portions and in the residue or the relative interests of the owners in the tract, and the amount for which as taxes and costs such residue was offered and sold, should appear, and whether similar facts should have been shown as to the lots described in the deed as redeemed, (see *Cardigan* v. *Page*, 6 N. H. 193 ; *Pierce* v. *Richardson*, 37 N. H. 315 ; *Smith* v. *Bodfish*, 27 Me. 289,) we do not deem it advisable now to inquire, as possibly such questions may not arise upon a trial of the case.

If the objection that Sargent's Purchase was never allotted rests merely upon the position that the lots were not actually marked upon the ground, it is not well taken, for an allotment by plan might indicate with certainty the location of each and every lot, although no lot lines had in fact been run out ; and if the lots could be made certain, that would be sufficient ; *Darling* v. *Crowell*, 6 N. H. 424 ; *Smith* v. *Messer*, 17 N. H. 428 ; *Wells* v. *Burbank*, 17 N. H. 412 ; *Corbett* v. *Norcross*, 35 N. H. 119 ; but whether it was ever properly so allot-

ted, we cannot decide upon the case before us. If it was material for
the defendant to prove this fact either for the purpose of showing that
the locus was not excepted or for any other reason, (see *Smith* v. *Bod-
fish*, 27 Me. 289,) it would seem that there is better evidence of the al-
lotment than that offered, and no reason is shown why it should not be
produced.

The constitution of this State provides in article 44, that "every bill
which shall have passed both houses of the general court, shall, before it
becomes a law, be presented to the Governor; if he approve, he shall
sign it," &c. ; and in article 45, that "every resolve shall be presented
to the Governor, and before the same shall take effect, shall be approved
by him," &c.　The court will take judicial notice of the fact that David
L. Morrill was Governor of the State in 1826, and of the genuineness
of his signature.　1 Greenl. Ev. sec. 6.　Pinkham's Grant was a mon-
ument described in the titles set up by each party, and the resolution by
which it was granted would seem admissible in determining its location,
but there is nothing in the case to show that the grants to Rogers and
others, to Green and to Martin, were in any way material.

The defendant claims that Sargent's Purchase is to be run out by the
siderial or astronomical meridian, or, as it is sometimes called, by the
"true" meridian, and not by the magnetic meridian.　Unquestionably, in
this State, the courses in a deed are to be run according to the magnetic
meridian, unless something appears to show that a different mode is in-
tended in the instrument.　4 Kent, 466, and n. ; 4 C. & H.'s Phil.
Ev. 550 ; *M'Iver* v. *Walker*, 9 Cranch 177 ; S. C. 4 Wheat. 444 ;
*Brooks* v. *Tyler*, 2 Vt. 348 ; *Owen* v. *Foster*, 13 Vt. 267 ; *Riley* v.
*Griffin*, 16 Geo. 147 ; *Young* v. *Leiper*, 4 Bibb 503 ; 1 U. S. Dig.
476, n. 51, and see *Jackson* v. *Stoats*, 2 Johns. Cas. 352 ; *Wilson*
v. *Inloes*, 6 Gill 163 ; *Clark* v. *Northy*, 19 Wend. 324 ; *Loring* v.
*Norton*, 8 Greenl. 69, and *Pernam* v. *Weed*, 6 Mass. 133.　We do
not understand the defendant seriously to question this, but he rests his
position upon the use of the word "due" in connection with the words
descriptive of the courses, claiming that "due north" means north by a
siderial meridian.　It is observable, that, in the description of Sargent's
Purchase, the last course from the southwesterly corner of Jackson is
merely "south," and that the defendants' view if logically followed out,
would seem to require the southern, western and northern boundary lines
of the Purchase to be run out by a siderial meridian, while a portion of
the eastern boundary is to be laid down according to the magnetic mer-
idian ; a result not particularly desirable in point of convenience, or very
likely to have been in fact intended by the parties.　The word "due" in
this connection means merely "exactly," and in fact adds nothing to the
description of the point of compass, for "due north" is exactly north,
and so is simple "north."　As the designation of the points of compass
is conventional, the word "due" applies with equal propriety to those
points as referred to either meridian.　We find no evidence that either
the law or usage in this State has appropriated the term specially to the
siderial meridian.　In various cases in our reports, and in many more
before our courts, deeds and pleadings have shown a use of the term like

that in the deed in question; see *Corbett* v. *Norcross*, 35 N. H. 100;
*Bowman* v. *Farmer*, 8 N. H. 402; yet this is the first time, so far as
we are aware, that such an effect has been claimed for it; and we find
the word used elsewhere in legal language by courts entitled to the high-
est respect, without regard to any such distinction as the defendant claims.
*Jackson* v. *Reeves*, 3 Caines 293; *Brandt* v. *Ogden*, 1 Johns. 156.
We find nothing in the strict meaning of the term, in its popular accep-
tation, or in its legal or scientific use, or in our own usages or history,
to sustain the defendants' claim, and he has directed us to no authority
for his position, which seems to us untenable.

It is impossible for us to ignore the fact as matter of history and of
common knowledge, that in this State private and even town boundaries
have almost, if not quite, uniformly been run out according to the mag-
netic meridian, and we must hold it part of the common law of this
State that the courses in deeds of private lands are to be run according
to the magnetic meridian, when no other is specially designated, and this
seems impliedly admitted by the defendant when he places his claim sole-
ly upon a supposed effect of the word "due," which, as we have seen,
does not in our view belong to it.

Any resort to proof of the actual intention of the parties or the sur-
veyor would be attended with all the mischiefs which have heretofore, by
the familiar general rule, excluded parol evidence of intention in the con-
struction of deeds, and in our judgment is not permissible. We do not
understand that proof was offered of any local custom, and the court, in
construing a deed, can hardly need the aid of opinions from experts in
surveying, either as to the meaning of the word "due," or as to the cus-
tom or the common law of this State in relation to the general mode of
surveying. The present method of surveying the public lands of the
United States can have no bearing upon the question here, as it was
specially adopted, at a comparatively recent date and long after the sys-
tem of surveying private boundaries in this State had been established
by ancient and long continued usage, if not originally fixed by the com-
mon law. The manner in which extensive public boundaries, like those
between States and nations, have been surveyed, can have but little
weight in the determination of the present question, for in such surveys
regard is had to accuracy, permanency and certainty of verification, rath-
er than to the expense or difficulty of the method or its practical conven-
ience or adaptation for common use in our ordinary surveying. As the
point in the present case is to be decided according to the law as already
established in this State, for the determination of private boundaries, the
relative advantages of the two systems are not in question before us, but
perhaps upon examination it will be found that in practice neither mode
gives perfect theoretical accuracy, and where the question of the adop-
tion of a system is open, it would seem a question of relative accuracy
and general convenience rather than of entire exactness. We are of
opinion that in the grant to Sargent the courses are to be construed as
referring to the magnetic meridian notwithstanding the addition of the
word "due" to their description.

The starting point for ascertaining the bounds of Sargent's Purchase

is the northeast corner of Dorcas Eastman's grant, and the authorities already cited are decisive that in this action at law it cannot be shown that the word "northeast" was inserted in the deed by mistake for "northwest." If nothing more appears, that corner is to be ascertained by looking to the terms of her grant; but if it appears that at the date of the grant to Sargent it had been practically located upon the ground in a manner to bind the parties to it, then the northeast corner as thus located is to be taken as the northeast corner intended in the deed to Sargent. *Hall* v. *Davis*, 36 N. H. 569; *Breck* v. *Young*, 11 N. H. 489; *Kellogg* v. *Smith*, 7 Cush. 376. Even if Willey had run a line for the south line of Sargent's Purchase, as it is not in any way referred to in the deed and as the act of Willey alone could not amount to a practical location of the grant, even if after the execution of the deed, and certainly not if prior to that, this could not control the description in the deed. Whether the northeast corner of Dorcas Eastman's lot is necessarily the southeast corner of Sargent's Purchase, or merely a point of beginning to run the due west line of three and a quarter miles, and whether that corner of Sargent's Purchase is to be found at the intersection of a line due south from the southwest corner of Jackson, with a due east and west line drawn through the northeast corner of Dorcas Eastman's grant, it is unnecessary now to inquire. The case is to be discharged.